[No. 4071.]

## ALBERT JOHNSON v. THE STATE.

1. PRACTICE—JURY LAW.—The ability "to write," prescribed by the Code of Procedure as one of the qualifications of a juror, is not satisfied by the proposed juror's ability to write his name and nothing more. The statute contemplates that the juror shall be able to express his ideas in writing.

2. SAME.—A proposed [j]uror stated on his voir dire that he heard the evidence in part on the habeas corpus trial of the accused, and formed, at that time, an opinion as to the guilt or innocence of the accused, but that the opinion so formed would not now influence his verdict; and that, notwithstanding such former opinion, he could render an impartial verdict according to the law and the evidence. At the instance of the prosecution, and over objection by the defense, the juror was held incompetent. *Held*, error. The juror did not state that he then entertained any conclusion as to the guilt or innocence of the defendant, and the opinion he spoke of was a past, and not a present opinion. Moreover, the juror declared that such former opinion would not influence his verdict, and without further examination showing that it probably would, the juror should not have been rejected over the defendant's objection.

3. SAME—RAPE—EVIDENCE.—The State was permitted, over the objection of the defendant, to prove by a witness the acts and declarations of the prosecuting witness after the commission of the alleged rape. *Held*, that the evidence was inadmissible. The rule on the subject is as follows: "In prosecutions for rape, the party injured being a witness, it is admissible to prove that she made complaint of the injury while it was recent, but the particulars of her complaint are not evidence, except to corroborate her testimony when attacked. In any view, such statements can not be received as independent evidence to show who committed the offense." See the opinion on the question.

4. SAME—ALIBI—CHARGE OF THE COURT.—The trial court charged the jury, in effect, that the burden of proof rested on the defendant to show by a preponderance of evidence the facts establishing the alibi relied upon as a defense, but that, if the defendant should show such facts as would raise a reasonable doubt as to whether he could have been present at the commission of the offense, he should be acquitted. *Held*, error, because the charge, in its terms, is contradictory and inconsistent; and in this State the burden is not on the defendant to prove his alibi. Proof of alibi is nothing but evidence controverting the State's hypothesis and proof of guilt.

APPEAL from the District Court of Washington. Tried below before the Hon. I. B. McFarland.

The conviction in this case was for the rape of Anna Knuppel, in Washington county, Texas, on the twenty-sixth day of January, 1886. A term of ninety-nine years in the penitentiary was the penalty imposed by the jury.

Anna Knuppel was the first witness for the State. She testified that she lived with her father, Frederick Knuppel, in Washington county, Texas, about four miles south of the town of Brenham. She did not know whether the road passing her father's house was the Brenham and Industry, or the Brenham and Wesley road. Witness went to the town of Brenham on the twenty-sixth day of January, 1886, to see Doctor Hussey, and to get some medicine. She was overtaken by Henry Kraemer and Gotlieb Roemer in a wagon, and rode to town with them. She arrived in Brenham before dinner, and left after dinner on foot, traveling south, on the track of the Gulf, Colorado and Santa Fe railroad track. At a point on the track, about one hundred and fifty yards from the point where it crossed the Brenham and Wesley road, the witness was assaulted by a negro man, whom she recognized as the defendant on trial. Witness did not see the defendant until about five minutes before he committed the assault. He came up behind her, walking on the left hand side of the track, the witness traveling along the right hand side of the track. The two were then separated just the width of the track. Defendant, when he reached the point abreast of the witness, asked her if she had any money to change. He then sprang upon the witness and struck her on the breast with one of his hands. He had a piece of iron, about a foot long and about as broad as three fingers, in his other hand. Defendant then threw the witness down, raised her clothes, threatened to kill her if she hallooed, got on top of her, and, by force and threats, had carnal knowledge of her, penetrating her person with his male member. Witness did not consent to his act of copulation. Witness was fifteen years and a few days old at the time the defendant assaulted her.

Having accomplished the rape of witness and released her, the defendant picked up a large stone and told witness that he would kill her if she said anything about it. The witness next saw the defendant at her father's house, in the custody of E. G. Langhammer, deputy sheriff of Washington county, and J. B. Lewis, sheriff of Austin county. Witness, on being released, went home through Keike's field. Arriving at home she threw herself on her bed, first taking off her clothes, which were soiled

and dirt stained. Her mother and her sister-in-law, Augusta Knuppel, were present. She told them of the outrage perpetrated upon her. The man who outraged the witness was a copper colored negro, neither a pure yellow nor a pure black negro. He had a scar on his face, either above or below the eye, but not immediately under it. About seven weeks elapsed after the outrage before the defendant was apprehended. One Willie Wills was first brought before witness, under arrest, but was released upon witness declaring that he was not the man who raped her. Another man was subsequently arrested for the rape, and released upon the witness's assurance that he was not the man. Defendant was brought to witness's father's house by Langhammer and Lewis, while witness was in the field. She recognized him at once as the party who assaulted and raped her.

Cross-examined, the witness testified that she could not locate the exact hour of the outrage, but she thought it occurred between two and three o'clock in the afternoon. The place of outrage was very near equi-distant between her father's house and the town of Brenham. Her father lived four miles from Brenham. The outrage was committed in a "cut" in the side of a railroad track. The banks of the "cut" were between two and six feet high. The soil in the "cut" was damp. The defendant wore a soft hat, of a gray color. The scar on his face was on the right side, and was curved in shape. He wore, at the time of the outrage, a gray coat and a pair of dark pants. Witness identified the defendant, when he was brought before her, by his face and features, and not by the scar, or other peculiarity. Witness did not observe the scar on defendant's face till he grappled her and threw her down. Defendant wore no hair on his face at the time of the outrage. He then was perfectly smooth faced. When brought before the witness, about seven weeks afterwards, he had a mustache and a very thin goatee. Neither of the two men first brought before the witness had hair on their faces, but both had scars under the eye. Witness never saw the defendant prior to his assault upon her. He was with her on that occasion from ten to fifteen minutes. He had her down about five minutes. It took witness about a half or three-quarters of an hour to get home from the place of the outrage. From that place the witness could barely see Weymeyer's house. The defendant got the stone after he assaulted, but before he raped the witness, and had both it and the piece of iron in his hand during the carnal process. Witness's calico dress was not

torn in the struggle, nor did it get soiled with blood or other fluid.  It got mud stained on the back and sleeve.  Witness reported the outrage to her mother, in the presence of her sister-in-law, Augusta Knuppel.  She remembered that she described the defendant to them about as she described him on this trial, except that she did not tell them defendant's age, which, she took then, and takes now, to be between seventeen and twenty years.  If the defendant on trial had a mustache on the twenty-sixth day of January, 1886, he is not the man who ravished the witness.  When defendant got off of the witness, he took fifteen cents in money from witness's dress pocket.  He first demanded of the witness what money she had.  Witness had never before testified to this act of robbery.

Doctor G. Becker testified, for the State, that, on the evening of January 26, 1886, he was called by Frederick Knuppel to make an examination of the person of his daughter Anna.  Witness reached Knuppel's house between three and four o'clock on that evening, and made a digital examination of the girl's sexual organ.  It was the witness's professional opinion that her sexual organ had been recently penetrated by a male organ.

Cross-examined, the witness testified, in substance, that he could only tell that the girl's vagina had been recently penetrated.  He could not say that the penetration was effected by a male organ or some other long, hard instrument.  He saw no blood or other fluid on the girl's clothes.  Her dress was somewhat mud soiled.

Mrs. Sophia Knuppel testified, for the State, that the prosecutrix, Anna Knuppel, was her daughter.  Anna was fifteen years old on the seventh day of December, 1885.  She was ravished on Tuesday, January 26, 1886.  Anna got home from town between one and three o'clock, weeping bitterly.  She begged witness to kill her, because she had been raped.  Her clothes were mud soiled.

Frederick Knuppel, the father of the prosecutrix, testified, for the State, that he returned home between three and four o'clock on the evening of Tuesday, January 26, 1886, and found his daughter in bed, weeping bitterly.  Witness and his son went to Brenham and secured the services of Doctor Becker.  Anna told the witness where she was assaulted, and witness examined the place.  It was a "cut" in the railroad near the Wesley road crossing.  The ground at that point showed that somebody had 'aid down there.  Witness found a stone, and a flat piece of iron

at that place.  The banks of the "cut" were two or three feet high, and were above the level of the railroad track.

Cross-examined, the witness testified that the "cut" in which the outrage was said to have been committed was about two and a half miles from the witness's house, and about one and a half miles from the town of Brenham. The stone and iron were found by witness in the "cut." The marks on the ground were partly in the "cut" and partly on the embankment. The impression of the body was on the embankment. The "cut" was about one mile from Weymeyer's "rent" house.

Henry Kraemer testified, for the State, that one evening in January, 1886, Anna Knuppel went with him in his wagon to Brenham. She got into the wagon at Kieke's tank. G. Roemer was in the wagon with witness. Anna did not leave town with the witness on that evening. She got out of his wagon at Anster's warehouse.

Gotlieb Roemer testified substantially as did Kraemer, except that he fixed the day as January 26, 1886.

Deputy sheriff E. G. Langhammer testified, for the State, that he first saw the defendant when sheriff Lewis brought him to Brenham from Austin county. Witness went with sheriff Lewis and defendant to Knuppel's house. Anna Knuppel declared the defendant to be the man who raped her, as soon as she saw him. She declared that she knew him not so much by the scar on the side of his face as by his general appearance. Anna was in the field when the witness, sheriff Lewis and the defendant arrived at her father's house. Witness sent her father after her. He met her himself before she reached the house, and admonished her to be particular in declaring for or against the man's identity. Defendant was left in the house with sheriff Lewis and Mrs. Knuppel. As soon as Anna stepped into the room she said that the defendant was the man who ravished her, but that he had grown a mustache since the outrage. Anna did not locate the scar on the man's face. She said, when she identified the defendant, that the black, stiff hat that he was then wearing was not the hat he wore at the time of the assault upon her. The capias delivered to witness for the arrest of the party who assaulted Anna Knuppel described an unknown negro man of light brown complexion, about eighteen years old, smooth face, with a scar on the right side of the face. Such description of the party was given witness by Frederick Knuppel. Upon such description, witness first arrested one Willie Wills, who was about eighteen

years of age, was smooth faced, and had a curved scar under his right eye. Wills was taken before the girl on Sunday, January 31, 1886, and was pronounced by her not the assailant. Witness subsequently took another man, of lighter complexion than defendant, to the girl. That man's name was Anderson Guyton. He was between sixteen and eighteen years of age, and was smooth faced, with the exception of a small scar on each side of his nose. Anna said that Guyton was not the man. She said that Wills was too dark of color, and that the scar on his face was not at the right place. She said that Guyton was too yellow, or light of complexion. When Anna identified the defendant as the man who outraged her, witness asked her, at sheriff Lewis's request, how she knew him. She replied that she knew him by his face. Witness then asked her if she recognized the scar, and she replied that she did, but that she knew the defendant best by his face and general appearance. Witness asked her if she believed or knew the defendant to be her assailant. She said she knew him to be the man who ravished her.

Cross-examined, witness said that defendant had a mustache when he first saw him. It may not have been quite as long, but was quite as thick then as now. Defendant then had on a black suit of clothes, and a black, stiff brimmed hat. A negro, named Ed Deadman, came to witness in Brenham, a few days after the alleged offense, and told witness that a negro boy, named Wash Boulding, junior, knew something. Witness asked Ed what Wash knew. Ed replied: "He knows the man who assaulted that German girl on the railroad." Witness soon afterwards found Wash in Brenham, and asked him about the matter. Wash replied: "I hear that a reward has been offered for the right man. If you will give me and my side partner the reward we will put you on to the right man." Witness asked him who his side partner was, and he said that Ed Deadman was. Witness then told him that old man Knuppel had offered a reward of fifty dollars for the arrest of the right man, and that he could collect and have the whole amount if he would put witness on the track of the right man. Shortly afterwards witness sent Wash Boulding, junior, to Robert Ford's, where defendant had been seen, to ascertain, if he could, the defendant's then whereabouts.

Robert Voight testified, for the State, that sheriff Lewis, on the eighteenth day of March, 1886, arrested the defendant while

the latter was at work for the witness, at his place near Industry, Austin county. Defendant, when arrested, had been working for the witness about a month.

Cross-examined, the witness said that when the defendant entered his employ he had a mustache, somewhat smaller than it is now, and was dressed in a dark suit of clothes, and wore a stiff brimmed, black hat. The State closed.

Henry Holle was the first witness for the defense. He testified that old man Knuppel and his wife came to his house on the night of January 26, 1886, and told him that their daughter Anna had been ravished on that evening. Witness went to Knuppel's house on the next morning, and Anna told him where the rape occurred. Witness went to the "cut" on the railroad indicated by the girl, and saw the marks and body prints on the ground. The banks of the "cut" at that point were five or six feet high. The body prints were not in the "cut," but were fourteen or fifteen steps distant, beyond the banks. The print of the head extended towards the railroad. The grass at that point was tramped and pressed down, and the impression of a pair of elbows and feet were plainly discernable. Heber Stone's house was the nearest the place, and was about a quarter of a mile distant. Weymeyer's "rent" house was about a half a mile distant. The impression of the body, elbows and feet, and the stone and piece of iron were found outside, and at least fifteen steps from the "cut." Anna described her assailant to the witness. She said he was a "knabe"—a young man, or boy—was smooth faced, and was neither "right white nor right black."

Cross-examined, the witness said that he went alone to the place of the alleged rape on the morning after it was said to have occurred. The trampled ground indicated that a scuffle had taken place at the point spoken of. Near the same spot the witness found a flat piece of iron, about a foot long, and a stone as large as a man could hold in one hand. The Wesley road passed the place at a distance of three or four hundred yards.

Willie Wills testified, for the defense, that he was between seventeen and eighteen years old, and had never had either a beard or mustache. The curved scar under witness's right eye was the compliment bestowed upon him in early youth by a mule. Mr. Langhammer arrested the witness on the Sunday after the alleged rape, as the perpetrator of that outrage, and took him to Knuppel's house for identification. Anna Knuppel

exonerated the witness at sight, saying that the witness was entirely too black to be the criminal. Defendant, at or about the time of the alleged outrage, slept at Robert Ford's place, a few hundred yards from the house in which the witness lived, and he worked at John Smith's. The witness slept with the defendant one night during the week following the alleged outrage, and told him, defendant, of his arrest upon this charge. Witness could not positively locate the night on which he slept with defendant, and told him about being arrested, but thought it was Monday, the night following his arrest and release. The defendant wore a mustache during the entire time that he lived in the witness's neighborhood. The witness never saw the defendant wearing a light suit of clothes or a light hat. He always wore a dark suit of clothes and a small, black, stiff brimmed hat, known as the "dude" hat.

Cross-examined, the witness said that he saw the defendant as many as two or three times during the week following the alleged rape. Witness told defendant about his, witness's, arrest, but neither of them discussed the matter.

Frank Wills, the father of the witness Willie Wills, testifying for the defense, detailed the incidents immediately preceding the arrest of Willie. Defendant was then in the house of Robert Ford, at which house the witness met the arresting party. This was on Sunday, January 31, 1886. Defendant had then been in the neighborhood about a month. He remained in that neighborhood about a week after the arrest and discharge of Willie. Throughout the whole time of his residence in that neighborhood, which included the day of the alleged rape, defendant wore a mustache. During that entire time he wore a pair of black jeans pants, a black frock coat, and a "Boston dipper" hat.

Cross-examined, witness said that Hood came with Hackworth to Ford's house at the time Willie Wills was arrested. Hood went into the room, at Ford's house, in which, at that very time, the defendant was sitting. Ki Roberts, Robert Ford and wife were present at the time. The party enticed Willie Wills off and arrested him, and witness knew nothing of Willie's arrest until about an hour afterwards, when he met him coming back from Knuppel's, having been taken there for identification and released. The witness believed that Langhammer and the others gave Willie a dollar as compensation for his false arrest. Witness could see no difference in the size and general appearance

of the defendant's mustache as it is now and as it was at and about the time of the alleged rape. Defendant was a married man and lived at Belleville.

Robert Ford testified, for the defense, that the defendant came to his place early in January, 1886, wearing a mustache about as well developed then as now. He had no light clothes. He wore a black coat and an originally black hat, with a stiff brim. Defendant worked for Smith, who lived in the neighborhood, and did not quit Smith until the close of the first week in February, 1886. On Saturday, February 6, 1886, defendant went to Brenham with Smith. Defendant boarded with the witness during the entire time that he worked for Smith. He went into Brenham but twice during that time to the knowledge of the witness, and on each of those occasions he rode a horse and led a mule for his wife to ride to witness's house. Witness was present on Sunday, January 31, when Mr. Hood and others came to his house to arrest Willie Wills. Defendant was also present, but displayed no trepidation or uneasiness. Witness was certain that the defendant was at work for John Smith on every day, including Monday and Tuesday, of the week prior to Sunday, January 31, 1886.

Mrs. Robert Ford, defendant's sister-in-law, testified in his behalf, substantially as did her husband, adding that she knew positively that the defendant was not absent from his work, except at meals, during the day, from Monday, January 25, 1886, to Sunday, January 31, 1886.

Willis Jackson testified, for the defense, that, during the defendant's residence at the house of Robert Ford, which included the day of the alleged rape, he wore a mustache, dark pants, black coat and a black, stiff brimmed hat.

Ki Roberts testified, for the defense, that he was at Robert Ford's on Sunday, January 31, 1885, when the party of white men came there to arrest Willie Wills. Defendant was there, but showed no signs of uneasiness. Witness saw defendant going to and from his work for a week after Willie Wills's arrest.

John Smith testified, for the defense, that defendant worked for him from early in January, 1886, until Saturday, February 6, 1886, which included the day of the alleged rape and the day of the arrest of Willie Wills. Witness settled with defendant in Voss Bros.'s store, in Brenham, on Saturday, February 6, 1886, and observed the defendant standing about town in Brenham all of that day. He did not appear to be dodging or avoiding any one.

Cross examined, witness said that defendant wore dark clothes and a black "dude" (stiff) hat while in his employ, and had a mustache. He frequently, instead of working, spent many hours sitting on a stump, reading his Bible or prayer book.

Several other witnesses testified, for the defense, concurring in the statement that the defendant, while in the neighborhood, and at work for Smith, from early in January, 1886, until February 6, 1886, wore a mustache and dressed in black coat, pants and stiff hat.

Scott Crenshaw and Wash Balding, senior, testified, for the defense, that they worked with the defendant for Smith, and were positive that defendant was at work in Smith's clearing all day on Monday, January 25, and Tuesday, January 26, 1886, which last day was the day of the alleged outrage. Balding testified that at its nearest point, the Gulf, Colorado and Santa Fe railroad track was four miles from Smith's clearing, where witness and defendant were at work on said Monday and Tuesday.

Dora Johnson, the defendant's wife, testified in his behalf, that, when defendant left his home in Belleville, in January, 1886, he had a mustache. Witness went to Robert Ford's house, in Washington county, about two weeks after defendant went to work for John Smith. Defendant met her in Brenham with a horse and mule and took her to Ford's house. He then had a mustache. He escorted witness back to Brenham a week later, going horseback. He then had a mustache. He got home (in Belleville) on the night of Saturday, February 6, 1886. He then had a mustache. In fact, witness had never known him without his mustache since he first grew it. When he left Belleville in January and returned in February, he had on a black suit of clothes, and a black, stiff hat. Witness had never seen him wear gray clothes or a soft, gray hat. Wesley Johnson, defendant's brother, testified substantially as did Dora Johnson, and, in addition, that defendant made no effort to hide out after his return to Belleville from Washington county, but on the contrary circulated freely, and several times went into sheriff Lewis's office.

Henry McRes testified, for the defense, that he was a barber by trade, and lived in Belleville. He frequently shaved the defendant, but was never permitted to shave off his mustache. He shaved defendant's face, except his upper lip, on the evening before he started from Belleville to Washington county.

Sheriff Lewis testified, for the defense, that he had never taken

notice of the scar on defendant's face until he arrested him for the rape of Anna Knuppel. Defendant came into witness's office early in February, 1886, to see about making a bond for a negro then in jail. Nothing about the defendant's manner attracted witness's attention at that time. Witness next saw defendant on Voight's place, near Industry, on March 18, 1886, when he arrested him. Arrest for rape would excite most men, but did not seem to alarm the defendant. Witness took defendant to Washington county, and went with him and Langhammer to Knuppel's house. Anna examined defendant closely, and finally declared him to be the man who outraged her. She said nothing about the scar on defendant's face, but spoke of it before the interview and inspection closed. Witness had known defendant for six or seven years, and had had him in his employ, but had never, prior to the trouble, observed the scar on his face. Defendant had always, so far as witness knew, sustained a good reputation in Belleville.

The witness, on his cross-examination, described the incidents of the interview when Anna Knuppel and defendant were brought face to face, substantially as did the witness Langhammer, adding that when Anna pronounced defendant to be her ravisher she placed her hands before her face and wept.

Messrs. Blake, Shelburne, and Wessendorf testified, for the defense, that they had long known the defendant, but had never noticed the scar on his face until their attention was called to it on this trial. Defendant had always sustained a good character in Belleville.

The motion for new trial raised the question discussed in the opinion.

*B. H. Bassett and E. B. Muse* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for rape, the punishment imposed being imprisonment in the penitentiary for ninety-nine years.

We desire to notice specially but three matters. First, in forming the jury, John Watson, a member of the special venire, being examined touching his qualifications as a juror, stated, in answer to questions, that he could read and write a little, but not

much; that he could read print and could write his name, but could not read hand writing unless it was very plainly written. The State challenged for cause, which was sustained by the court, and defendant excepted.

We have examined all the cases accessible bearing upon this subject, but find none directly in point. We are of the opinion that the juror was incompetent. The statute must have intended something practical. That a person can write his name certainly does not fill the measure of the statutory requirement that the juror should be able to *write*. We think that he should be able to express his ideas in words upon paper, with pen or pencil. (Rainey v. The State, 20 Texas Ct. App., 473.)

G. W. Verness, a member of the special venire, being examined touching his qualifications, in answer to questions propounded on the part of the State, stated that "he had heard a portion of the evidence on the habeas corpus trial, and had then formed an opinion in reference to the guilt or innocence of defendant, but that this opinion, so formed, would not now influence his verdict, and that he could, notwithstanding such former opinion, render an impartial verdict according to the law and the evidence." At the instance of the State, and over objection by the defense, he was held incompetent, and defendant reserved a bill.

We are of the opinion that this juror was competent. It will be noticed that the juror did not state that he had at that time a formed opinion, but from the trial it would seem that he referred to the former opinion. Whether he then had an opinion does not appear from the record. But, let us suppose that he had, and entertained this opinion up to the time of the trial. He states that it would not influence his verdict, and hence, without further examination developing that probably such opinion would affect his verdict, we think he was competent. It was error to reject the juror. (Thompson v. The State, 19 Texas Ct. App., 611.)

Second. Over the objection of defendant, the State introduced in evidence the conduct and declarations of Anna Knuppel, the prosecutrix, after the commission of the offense. These declarations, etc., are claimed by the State to be admissible as the *res gestæ*. The rule upon this subject will be found clearly stated and illustrated in Wharton's Criminal Law, volume 1, section 566, thus: "In prosecutions for rape, the party injured being a witness, it is admissible to prove that she made complaint of the

injury while it was recent, but the particulars of her complaint have been held not to be evidence, except to corroborate her testimony when attacked. And in any view, such statements can not be received as independent evidence to show who committed the offense. * * * Since such evidence is admissible merely as corroboration, it can not be used to patch out the case of the prosecution by supplying new facts. Thus, on the trial for rape which came before the Virginia Court of Appeals, the main question was as to the identity of the prisoner. The female was examined, and, although she swore positively that the prisoner was the person who committed the outrage upon her, she declined to give a description of him as at the time of the outrage. The commonwealth then introduced a witness to prove the particulars of the description of the person who committed the outrage, given by the prosecutrix to the witness on the morning after the rape was committed. This, for the reason just given, was properly held inadmissible." (See also 2 Bish. Crim. Proc., sec. 963.) If the State could not show in this manner who committed the offense, certainly the description of the offender given by the prosecutrix can not be introduced in evidence.

Third. There was testimony of quite a number of witnesses very strongly supporting an alibi. Upon this subject the learned judge charged the jury that the defendant relies on an alibi as a defense; that is, on proof that, at the time of the offense, if any was committed, he was at another place, which rendered it impossible for him to have been present at the commission of the offense. On this issue the burden of proof is on the defendant, to show by a preponderance of evidence the facts establishing the alibi. But if the defendant has shown such facts as raise a reasonable doubt as to whether he could have been present at the commission of the offense * * or not, you will acquit him."

These propositions are inconsistent and in direct conflict. If the burden of proof is on defendant to establish his alibi by a preponderance of evidence, then the doctrine of reasonable doubt can not possibly apply. Whenever, in a criminal or civil case, a party is required to prove a fact (and this always means by a preponderance of testimony), the reasonable doubt does not obtain, and can not be applied to the negative or opposite of such fact.

If A. be at Galveston at a given time he is guilty, but if at Houston at that time he is not guilty. The burden is on A. to prove that he was at Houston. If this be so, a doubt that he was at Galveston is not in the proposition, because he must prove that he was at Houston, and this proof must be made by a preponderance of evidence; and a doubt that he was at Galveston does not aid his proof that he was at Houston. On the other hand, his proof that he was at Houston may not be by a preponderance of the evidence, but amply sufficient to raise a reasonable doubt that he was at Galveston.

Let us view these propositions at work. One of the jurors says: "I doubt that A. was at Galveston." To this another replies: "So do I, but has A. proved by a preponderance of evidence that he was at Houston?" "No," says the first, "but I doubt, from his evidence in support of his being at Houston, that he was at Galveston." "But," replies the other, "I know that he has not proven by a preponderance of testimony that he was not at Galveston, and we are instructed by the judge that he must do this,—that this burden is upon him." In comes the third juror, and suggests that the only way out of this trouble is to obey all that the judge says upon this subject. To this all agree. "Now then," says he, "we will hold defendant to the proof that he was at Houston, for we are told by the judge that the burden is on him, and that he must prove by the preponderance of the evidence. Has he discharged this burden?" All say: "No." Then he must be convicted. But if he has discharged this burden, then the jury might have a reasonable doubt of his being at Galveston. But the first juror replies: "The judge charged us that if defendant has shown such facts as raise a reasonable doubt as to whether he was at Galveston or not, we should acquit." To this all agree; but the second juror says: "We are also very plainly told by his honor, that the burden is on him to prove that he was not at Galveston, and this must be done by the preponderance of evidence, and we have all agreed that it has not been done by him."

We have adopted the above manner of showing that the two propositions are in conflict, and not at all consistent; and for the further purpose of showing that they are misleading, and calculated to confuse the jury. We desire simply to add that it is well settled in this State, that the burden of proving an alibi is not on a defendant; that an alibi is an attack on the presence

of defendant at the place of the crime, and hence an attack on guilt.

For the errors noticed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*