James Vernon ALLRIDGE,
III, Appellant,

v.

The STATE of Texas, Appellee.

No. 69838.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 13, 1991.

Rehearing Denied Jan. 27, 1993.

474

George Gallagher, William S. Harris, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall, Delonia A. Watson, Michael Parrish and Stanley Hatcher, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code, § 19.-03(a)(2). After the jury made an affirmative finding on both of the special issues submitted under Art. 37.071(b)(1) and (2), V.A.C.C.P., the trial court imposed the penalty of death. This case is before us on direct appeal.

Appellant brought a total of twenty-one points of error to this Court, including an argument that the evidence at trial was insufficient to support the jury's affirmative answer to the second special issue. We will affirm the judgment of the trial court. A review of the evidence admitted at appellant's trial is necessary.

On Sunday night, February 3, 1985, appellant and his brother, Ronald Allridge, left their apartment to rob a Circle K convenience store on Sycamore School Road in Fort Worth. Appellant took his chrome Raven .25 calibre semi-automatic pistol with him. Ronald Allridge was driving appellant's car. Appellant and his brother selected a Circle K store because appellant, due to his past experience as an employee with Circle K, was familiar with the store's procedures and appellant also knew where the combination to the safe was kept at a Circle K store. Ronald dropped appellant off and went around the corner to wait for him.

It was close to midnight, and the attendant, Brian Clendennen, had already closed the store for the evening. Clendennen was working there on that evening as a substitute for another clerk. Appellant and Clendennen knew each other from when appellant had worked for Circle K from December, 1984 through January, 1985. Appellant knew Clendennen by name, and asked for change for a dollar to use the phone. Clendennen unlocked the door and made change for appellant. Appellant pretended to use the phone and left to rejoin his brother.

Appellant's brother accused him of chickening out of the robbery. He dropped appellant off at the store a second time. Appellant went to the door and knocked. Clendennen opened the door and appellant pulled his gun, forcing Clendennen to admit him into the store. Appellant took Clendennen to the back storeroom and tied the clerk's hands behind his back. Appellant then emptied the register and safe of their money, placing it in a sack. Some of the change fell to the floor. Appellant heard movement in the storeroom, went there and found that Clendennen had moved. Appel-

lant made Clendennen get back on his knees and shot him twice in the back of the head. Appellant left with the bills and some of the change taken from the store.

When appellant rejoined his brother, he discovered that his pistol had jammed on the second shot. Appellant decided to return to the store to be certain that Clendennen was dead. When appellant got to the front of the store, he saw a woman waiting in a car in the parking lot. Without entering the store, appellant turned around and ran from the scene and rejoined his brother. Appellant and his brother returned to their apartment and counted the money. They got $336 in the robbery.

The woman waiting in the car was Brian Clendennen's mother. After appellant fled the scene, Mrs. Clendennen opened the door and looked in. She saw a bunch of change laying on the floor, but did not see her son. She ran back to her car and went to the Whataburger on Sycamore School Road to get help. Someone called the police. Other people ran down to the Circle K to try to help. When the police arrived, they found Brian Clendennen in the back storeroom of the Circle K, his hands still tied behind his back. He was barely breathing. He died the next day. An autopsy confirmed that he died from the gunshot wound to the head he received during the course of the robbery. The police retrieved an intact slug from the victim's head. They had no leads in this robbery-murder for six weeks.

On March 25, 1985, three men pulled a robbery-murder at the Whataburger Restaurant on Sycamore School Road. A witness positively identified appellant's brother, Ronald, as the shooter in the robbery-murder. The police arrested appellant and his brother at their apartment on March 25, 1985. After the arrest, appellant was taken outside the apartment to the parking lot. The police testified that appellant was not threatened, promised, or physically abused. Appellant then signed a consent to search his room in the apartment. During the search, the police recovered the Raven .25 calibre pistol appellant used in the Circle K offense.

On the night of March 25, 1985, appellant was arraigned by Municipal Court Judge Bernal for the Whataburger offense. At trial Bernal testified that she did not recall if appellant requested an attorney to be appointed to represent him. Her bailiff, A.D. Marshall, testified that appellant did not request an attorney at his arraignment. At 10:00 a.m. on March 26, 1985, appellant gave the police a written confession admitting that he killed Brian Clendennen in the course of robbing him at the Circle K store. The detective who took the confession testified that appellant did not invoke any rights or request the assistance of counsel during the interrogation.

Testimony at trial revealed that appellant purchased the Raven .25 calibre pistol at a pawn shop on September 11, 1984. A ballistics expert testified that the bullet retrieved from the head of the victim was fired from the Raven .25 calibre pistol.

In his first point of error, appellant argued the trial court erred by excusing venireperson Martin Osborn for cause in violation of the *Witherspoon*[1] doctrine. According to appellant, Osborn's opinion of the death penalty merely involved his emotions and would only affect his view of the seriousness of his task as a capital juror. Appellant argued that Osborn's answers on voir dire implied that he could follow the law and not be controlled by his feelings.

The State replied that Osborn was a venireperson whose beliefs about the death penalty would substantially impair his performance as a capital juror. The State explained that Osborn's entire voir dire revealed strong feelings that would impair him from fairly and impartially carrying out his oath as a capital juror. Also, the State alleged that Osborn's scruples indicate he would hold the State to a higher burden of proof than required by law.

■ In order to assess Osborn's capacity to obey his oath and follow the trial court's instructions, we will not focus on only one answer or passage from his voir dire. This Court must examine Osborn's testimony as a whole. *Fearance v. State,*

771 S.W.2d 486, at 500 (Tex.Cr.App.1988) cert. denied, 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989); *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981); *Pierce v. State,* 604 S.W.2d 185 (Tex.Cr.App.1980); *Vigneault v. State,* 600 S.W.2d 318 (Tex. Cr.App.1980); and *Cuevas v. State,* 575 S.W.2d 543 (Tex.Cr.App.1978). We will review the entire record of Osborn's voir dire to determine if it shows that Osborn's opposition to the death penalty would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and oath. *Fearance,* 771 S.W.2d at 500–501; *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

This review is an assessment of whether the record of voir dire supports the trial court's decision that a venireperson was substantially impaired in his or her ability to perform the duties of a juror in accordance with their instructions and oath, rather than an analysis of whether or not this Court would have excused the venireperson for cause. *Perillo v. State,* 758 S.W.2d 567, at 577 (Tex.Cr.App.1988). This is a task which a trial court is uniquely capable of performing. *Fearance,* 771 S.W.2d at 501.

■ When the record of voir dire is unclear, as it is in the instant case with venireperson Osborn, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt,* 105 S.Ct. at 852. This results in a finding by the trial court concerning the venireperson's state of mind. This finding will be based upon many factors, including determinations of the credibility and demeanor of the venireperson. *Wainwright v. Witt,* at 854; *Bird v. State,* 692 S.W.2d 65 (Tex. Cr.App.1985) cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). If the entire record contains sufficient evidence to support a trial court's determination that a juror would be prevented or substantially impaired from obeying his

---

**1.** *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

oath and following his instructions, deference must be paid to that determination. *Fearance v. State,* 771 S.W.2d at 501–502.

■ In the instant case, Venireperson Osborn explained that as a result of his experiences in Viet Nam, he did not believe that he could make a decision on the death penalty. Osborn stated that he had a "gut" feeling that he could not assess the death penalty, and that he'd be very uncomfortable casting the final vote of "yes". He acknowledged his feelings were strong and would tend to prevent him from answering the special issues affirmatively. He also stated that he could not sign the verdict as foreman. The state then submitted Osborn to the trial court to be excused for cause. Appellant requested an opportunity to rehabilitate Osborn.

Appellant's trial counsel asked Osborn if he could follow the oath and answer the questions honestly. Osborn replied that he would be as honest as he possibly could, but that it would be tempered by his "basic instincts that it is wrong for one person to take another's life." When the trial court asked Osborn if he would answer the special issues "no" just to avoid the death penalty, he responded, "I don't honestly know.... I can't say." The trial court then denied the state's challenge. The trial court permitted the state to resume its voir dire of Osborn.

The state asked Osborn about the burden of proof at the punishment phase of appellant's trial. Osborn replied that he would have to have "little or no doubt" that the answers to the special issues were "yes" before he could answer them affirmatively. Osborn later said there could be some doubt and he would still vote "yes".

The state asked Osborn whether his feelings about the death penalty would bias him. He replied that his feelings would tend to bias him against the death penalty and for the saving of a life. Osborn said that he did not think he could honestly take the oath and not "do violence" to his strong feelings. Realizing the severe consequences of a yes vote on the special issues, Osborn responded that he thought his feelings might change how he viewed the evidence at trial. The trial court then granted the state's resubmission of Osborn to be excused for cause.

Appellant requested another opportunity to rehabilitate Osborn. Initially, the trial court denied the request. When appellant pointed out that Osborn had been re-submitted for cause, the trial court granted his request to ask Osborn more questions. After listening to Osborn explain how his strong feelings about the consequences of his vote would affect his decisions, the trial court stopped the voir dire of Osborn and granted the state's challenge for cause.

■ In a capital case, the State is entitled to jurors who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Perillo v. State,* 758 S.W.2d at 577; and *Adams v. Texas,* 100 S.Ct. 2521 at 2526. From his responses on voir dire, it appears that Osborn was torn between the obligation to honestly comply with his oath as a juror and his strong feelings in opposition to the death penalty. Osborn's answers that those feelings would influence his assessment of the evidence at punishment and affect his ability to comply with his oath support the trial court's determination that Osborn was substantially impaired in his ability to perform his duties as a capital juror in accordance with his instructions and oath. *Fearance v. State,* 771 S.W.2d at 502; and *Wainwright v. Witt,* 105 S.Ct. 844, at 852. Osborn's answers that he would have to have little or no doubt that an answer to a special issue should be yes for him to vote that way indicate he would hold the state to a greater burden of proof at the punishment phase of trial than required by statute. This also supports the trial court's decision to excuse Osborn for cause. *Sawyers v. State,* 724 S.W.2d 24, at 30 (Tex.Cr.App.1986); and *Little v. State,* 758 S.W.2d 551, at 554–555 (Tex.Cr.App. 1988). Appellant's first point of error is overruled.

■ In appellant's second point of error, he argued that the trial court erred when it interrupted his attempt to rehabilitate Martin Osborn after the trial court decided to

grant the State's challenge for cause. As noted above, the trial court permitted appellant an attempt to rehabilitate Osborn. After listening to Osborn's responses to appellant's questions, the trial court terminated the voir dire of Osborn. Initially we note that the error presented on appeal in this point does not comport with appellant's objection at trial. At trial, appellant stated:

> TRIAL COUNSEL: "Your Honor, I would raise our objection and our objection would be that I think he said earlier that he would be able to follow his oath and for that reason, I submit that he is qualified."

Appellant did not object that the trial court was improperly limiting his voir dire, or that the trial court kept him from intelligently exercising his voir dire of Osborn. Error has not been preserved. *Sawyers v. State,* 724 S.W.2d at 28. Also, a trial court has wide discretion in controlling voir dire examination. *Allridge v. State,* 762 S.W.2d 146, at 170 (Tex.Cr.App.1988); and cases cited therein. Appellant has not pointed out how the trial court in the instant case abused that discretion. Appellant's second point of error is overruled.

█ In his third point of error, appellant argued that the trial court abused its discretion in improperly limiting appellant's voir dire of venireperson Elizabeth Smith. Appellant sought to explore Smith's racial attitudes in the context of Smith being a white woman, appellant being a black man, and the victim being a white male.

Without quoting at length from the record[2], Smith was asked over fifteen questions by both the state's attorney and appellant about her opinions regarding the role that racial considerations play in the criminal justice system, her personal opinions about minorities, and her experiences with black people both at work and in relation to her children's school experiences. At that point, appellant asked the following question:

> DEFENSE ATTORNEY: "What is your opinion of court-ordered busing to achieve—excuse me—integration?"

2. See *Kinnamon v. State,* 791 S.W.2d 84, at 99

> PROSECUTOR: "I'm going to object. This is improper voir dire in this case."
>
> TRIAL COURT: "I am going to sustain the objection to that question."
>
> DEFENSE ATTORNEY: "Well, Your Honor, I think we are entitled to explore these opinions, they don't have to be direct, and I'd cite the case of Hamm versus South Carolina, a Supreme Court case, and I don't think that my questions have to be simple, direct questions."
>
> TRIAL COURT: "I don't think they do either, but I am going to sustain the objection to the last one."

We find appellant's argument to be unpersuasive. First, we note that the case relied upon by appellant, *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), is distinguishable from the instant case. In *Ham,* the trial court limited voir dire to three questions about bias in general, none of which touched upon the issue of racial prejudice. *Ham,* 93 S.Ct. at 850, footnote 3. Justice Rhenquist concluded, "Because of the trial court's refusal to make any inquiry as to racial bias of the prospective jurors after petitioner's timely request therefor, the judgment ... is reversed." *Ham,* 93 S.Ct. at 851. In contrast, venireperson Smith was extensively questioned about whether her racial attitudes affected both her day-to-day life or her potential performance as a capital juror. *Ham* is not controlling in the instant case.

█ Second, the trial court did not abuse its discretion by not allowing appellant to ask Smith the "busing" question. As noted in appellant's second point of error, a trial court has wide discretion in controlling the voir dire examination. See *Allridge v. State,* 762 S.W.2d at 170, and the cases cited therein. "A trial court is empowered to impose reasonable restrictions on the conduct of voir dire. The exercise of that power is within the sound discretion of the trial judge." *Marquez v. State,* 725 S.W.2d 217, at 238 (Tex.Cr.App. 1987), and the cases cited therein.

(Tex.Cr.App.1990).

**480**

■ This discretion includes the power to terminate needlessly duplicitous or repetitious questioning. *Allridge v. State*, 762 S.W.2d at 170. In *Marquez*, the trial court was held to have properly exercised its discretion in not allowing defense counsel a third opportunity to explore the distinctions between direct and circumstantial evidence. In the instant case, appellant extensively questioned Smith about her racial attitudes, including her feelings and opinion about her children attending school with, and socializing with, black children. The question about her opinion of busing to achieve integration was both duplicitous and, essentially, repetitious. The trial court did not abuse its discretion in sustaining the state's objection to this question. *Allridge, Marquez.* Appellant's third point of error is overruled.

■ In appellant's fourth point of error, he argued the trial court abused its discretion by improperly restricting the voir dire of venireperson Bob Beauchamp. Appellant alleged that this prevented him from intelligently exercising his voir dire. Specifically, appellant complained of being barred by the trial court from asking Beauchamp, "What circumstances in your opinion warrant the imposition of the death penalty?" Appellant used one of his peremptory challenges on Beauchamp.

Prior to being asked this question, Beauchamp discussed with both the State and appellant his general opinions on the potential range of punishment in the instant case. Beauchamp indicated that he had always believed that the death penalty was appropriate "where the circumstances may warrant." Beauchamp also indicated that he could give fair consideration to the full range of punishment, including probation if appellant was found guilty of murder. Beauchamp explained that he "would have no difficulty giving the minimum sentence" if the evidence indicated that was fair. At that point in voir dire, appellant's counsel asked Beauchamp the question that is the subject of this point of error.

The state objected that this question was "an attempt to bind this juror and get him to commit to something." The trial court sustained the objection. Appellant's counsel then asked a second question on the subject:

DEFENSE ATTORNEY: "Are there particular types of crime that you philosophically feel are appropriately the subject of capital punishment?"

DISTRICT ATTORNEY: "Same objection."

TRIAL COURT: "I will let him answer that question just as far as the category of crime generally."

BEAUCHAMP: "Not by the crime itself, no, sir."

■ Appellant premised this argument on his right to explore a prospective juror's opinion on the death penalty. When a proper question is asked and the opportunity to get an answer is denied, a defendant has been barred from intelligently exercising his right to voir dire and the harm is presumed. Art. I, § 10, Tex. Const.; *Smith v. State*, 703 S.W.2d 641 (Tex.Cr. App.1985); and *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979). The State responded in its brief that the question asked by appellant's counsel was not proper. Therefore, it was not an abuse of discretion for the trial court to bar Beauchamp from answering it. We agree.

■ This Court has held that an attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts. "It is improper to inquire how a venireman (sic) would respond to particular circumstances as presented in a hypothetical question." *Cuevas v. State*, 742 S.W.2d 331, at 336 (Tex.Cr. App.1987). It would also be improper to ask an open-ended question designed so the venireperson could set the hypothetical parameters for their decision-making. In the instant case, appellant's counsel requested Beauchamp to devise a set of facts and to speculate regarding what decision he would make in that situation. This was not relevant to the issue of whether Beauchamp could fairly consider the full range of punishment in the instant case based solely upon the facts proven at trial.

Regarding this issue, the trial court did not restrict either party's questioning of Beauchamp about his ability to fairly consider the full range of punishment in the instant case. As set out above, Beauchamp was extensively questioned by both appellant and the State on the minimum and maximum penalty which could be assessed. Because the trial court did not hinder appellant's questioning of Beauchamp about his opinion of assessing probation, imprisonment, or death, but only restricted appellant's reliance on hypothetical fact situations, the trial court did not abuse its discretion. *Allridge v. State*, 762 S.W.2d at 163–164; and *Cuevas v. State*, 742 S.W.2d at 336. Appellant's fourth point of error is overruled.

Appellant grouped his fifth, sixth and seventh points of error in a single argument. This Court will consider them together. Appellant argued in these three points of error that the trial court erred when it refused to excuse for cause venirepersons Theodore Kelker, Constance Priester and Leslie Lasseter when they stated they would not consider certain mitigating evidence when answering the special issues on punishment. See Art. 37.071(b)(1) and (2), V.A.C.C.P.

Venireperson Kelker stated on voir dire that he would not consider appellant's age or family background in answering special issues one and two. However, Kelker did say that he would consider appellant's criminal history and whether appellant acted under the domination of another person in answering those issues. Venireperson Priester stated that she would not consider appellant's age, family background, whether he was acting under the domination of another person, or mercy in answering the issues. She did state that she would take into consideration appellant's past criminal history. Venireperson Lasseter stated that she would not consider appellant's criminal history, age, family background, or mercy in answering the issues. All three venirepersons stated that they would give fair consideration to the full range of punishment that could be assessed for murder, see V.T.C.A., Penal Code § 19.02(a)(1), and capital murder, depending on the proof admitted at trial.

Appellant requested that each juror be excused for cause, because the venirepersons' answers on voir dire indicated they could not give fair consideration to the appropriate mitigating factors under the law "as pronounced by the Supreme Court in Lockett v. Ohio and Eddings versus Oklahoma.[3]" The trial court denied each request for an excusal for cause. Appellant then, exercised a peremptory challenge on each of the three venirepersons.

■■■ In these three points of error, appellant asserted that each of these venirepersons had a bias against the law, see Art. 35.16(c)(2), V.A.C.C.P., because they stated they would not consider mitigating evidence. Appellant claimed he was entitled to a panel of jurors who would consider all the mitigating evidence which he was entitled to present to the jury. Appellant cites no authority for his argument that these jurors were biased against the law. The State responded that it was not required that a juror must consider any particular piece of evidence as mitigating; the law only required that appellant be allowed to introduce mitigating evidence. It was up to the trier of fact to determine what weight to give any evidence placed before it. We agree.

3. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Recently, the Supreme Court addressed the issue of whether the Texas capital murder scheme adequately allowed a jury to consider evidence in mitigation of assessment of the death penalty. See *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); and *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In *Penry,* the Justice O'Connor wrote that "it is not simply enough to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence," *Penry,* 109 S.Ct. at 2947. She did not write that a juror was required to consider whatever evidence a defendant admitted at punishment in mitigation of punishment, but instead that the juror be free to consider or not to consider that mitigating evidence.

This Court has written on the issue appellant raised in these three points of error. In *Cuevas v. State*, 742 S.W.2d 331 (Tex.Cr.App.1987); cert. denied 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988), this Court held:

"Appellant contends the trial court erroneously denied his challenges to veniremen (sic) Gloria Fishman, Barry Hluchan, and Lawrence Dunn. Appellant claims the veniremen would have refused to consider certain factors in mitigation of punishment....

"the trier of fact must not be precluded from considering any relevant mitigating evidence in answering the special issues. However, the cases do not mandate the trier of fact must give any specified weight to a particular piece of evidence. The amount of weight that the fact-finder must give any particular piece of mitigating evidence is left to the range of judgement and discretion exercised by each juror."

*Cuevas*, at 345–346.

See also *Cordova v. State*, 733 S.W.2d 175, at 189 (Tex.Cr.App.1987); and *Johnson v. State*, 773 S.W.2d 322, at 331 (Tex.Cr.App. 1989). In these cases, this Court concluded it is not error for a trial court to overrule a challenge for cause where it is shown that a juror will not give a particular variety of mitigating evidence any consideration. In these cases, the trial courts did not abuse their discretion in denying the defendants' challenges for cause.

In the instant case, the three venirepersons were also not shown to have a bias or prejudice against the law. Kelker, Priester and Lasseter merely said there were some pieces of evidence they did not view as mitigating. The trial court correctly overruled appellants requests that they all be excused for cause. *Cuevas, supra; Cordova, supra;* and *Johnson, supra.* Appellant's fifth, sixth and seventh points of error are overruled.

In appellant's eighth point of error he argued the trial court erred when it refused to excuse venireperson Early Wellborn for cause, because Wellborn harbored a bias against a part of the law appellant was entitled to rely upon for punishment. Appellant claimed he was entitled to rely upon his eligibility for probation if the jury convicted him of the lesser offense of murder. In order to assess Wellborn's capacity to consider the full range of punishment and follow the trial court's instructions, we will not focus on only one answer or passage from his voir dire. This Court must examine Wellborn's testimony as a whole. *Pyles v. State*, 755 S.W.2d 98, at 103–106 (Tex.Cr.App.1988) cert. denied, 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988); *Fearance*, 771 S.W.2d at 500; *Porter*, 623 S.W.2d 374; *Pierce*, 604 S.W.2d 185; *Vigneault*, 600 S.W.2d 318; and *Cuevas*, 575 S.W.2d 543. We will review the entire record of Wellborn's voir dire to determine if it shows that Wellborn's opposition to the minimum punishment for murder would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and oath. This review is an assessment of whether the record of voir dire supports the trial court's decision that a venireperson was substantially impaired in his or her ability to perform the duties of a juror in accordance with their instructions and oath, rather than an analysis of whether or not this Court would have excused the venireperson for cause. *Perillo*, 758 S.W.2d at 577. This is a task which a trial court is uniquely capable of performing. *Fearance*, 771 S.W.2d at 501.

"Great deference is to be given to the decision of the trial court who has broad discretion in ruling on a challenge for cause, because the trial court is present to observe the venireperson, including the demeanor and tenor of the venireperson." *Pyles*, 755 S.W.2d at 106; and cases cited therein. We find there is support in the record that Wellborn's belief would not amount to a bias or prejudice against the law. Art. 35.16(b)(3) and (c)(2), V.A.C.C.P.

Initially on voir dire, Wellborn told the State that he could consider the full range of punishment, including probation if the sentence assessed was ten years or less. When appellant began to question Wellborn, he explained the nature of probation and asked Wellborn if he could conceive of

a set of facts where he could sentence someone to five to ten years for murder. Wellborn replied in the negative, that he thought a person convicted of murder "needs to serve some time." Wellborn then stated that he could consider probation if the sentence was five to ten years. When appellant asked Wellborn if he thought "the law to be too lenient" if it allowed that low a range of punishment to a murderer, Wellborn responded, "Right." Appellant then submitted Wellborn for cause.

The State was permitted to take Wellborn back on direct examination. During rehabilitation, Wellborn acknowledged that he would have an open mind on the full range of punishment. He replied affirmatively to questions on whether he could follow the law and give fair consideration to probation. The trial court then denied appellant's challenge for cause of Wellborn.

Appellant resumed voir dire of Wellborn on the issue of the full range of punishment:

Q: "Do you see any way for the offense of murder that in good conscience you could say that 5 to 10 years is an appropriate punishment?"

A: "I could probably see it in some. It depends on the case itself and the circumstances surrounding it."

Wellborn explained to appellant that he didn't "really understand" appellant's question about whether he could ever assess the minimum punishment. Appellant again submitted Wellborn for cause.

The trial court then asked Wellborn questions on whether he could consider the full range of punishment:

Q: "Could you say it doesn't matter what the facts are, if it's a murder case, it doesn't matter what the circumstances were, there is no way I could think about giving five years."

A: "I could give five years for the—by that—on the case itself through the evidence."

Q: "Depending on what the facts are?"

A: "Yeah."

Wellborn acknowledged to the trial court that "Depending on what the facts are," he could consider giving the minimum punishment. The trial court overruled appellant's challenge for cause of Wellborn. Appellant then exercised a peremptory strike of Wellborn.

We find the record of Wellborn's voir dire supports the trial court's conclusion that Wellborn was not challengeable for cause due to a bias against considering, and ultimately assessing, a potential minimum sentence for the lesser offense of murder. Wellborn stated that he could set aside his caution about assessing the minimum punishment and fairly consider the full range of punishment according to the facts and circumstances of the case. Wellborn's views of the range of punishment did not amount to a bias or prejudice against the law. *Pyles*, 755 S.W.2d at 106. Appellant's eighth point of error is overruled.

In appellant's ninth point of error he argued the trial court abused its discretion by refusing to excuse venireperson Sharon Henager for cause due to her limited vocabulary and reading ability. Though appellant concedes in his brief that Henager met the requirement of being able to express herself in writing, he still maintains she did not satisfy the requirements of Art. 35.16(a)(11), V.A.C.C.P., because she did not understand some words until they were explained to her.

In *Johnson v. State*, this Court explained how to resolve a dispute over the literacy qualifications of a prospective juror:

"It has long been the law of this State that the statutory requirement that jurors be able to read and write meant something more than mere ability to "write his name and nothing more." *Hernandez v. State*, 506 S.W.2d 884 (Tex.Cr.App.1974). Rather, the prospective juror should possess the ability to express their ideas in words upon paper. *Hernandez* at 887 citing *Johnson v. State*, 21 Tex.App. 368, 17 S.W. 252 (1886). This is a determination which

rightfully belongs to the trial court and, absent an abuse of discretion, such a finding will not be disturbed on appeal. *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr. App.1979) (vacated and remanded on other grounds, 453 U.S. 902, 101 S.Ct. 3133, 69 L.Ed.2d 988 (1981))."

*Johnson v. State,* 773 S.W.2d at 331. See also *Allridge v. State,* 762 S.W.2d 146, at 164–165.

■ In the instant case, Henager's answers on voir dire demonstrate she possessed an ability to read and write sufficient to meet the requirements of Art. 35.-16(a)(11). Henager stated that she was a high school graduate. (In *Johnson, supra,* and *Allridge, supra,* the prospective jurors' education ended after the fourth grade.) She explained that she had completed her juror questionnaire herself. (In *Johnson, supra,* the prospective juror left most of the questionnaire answers blank because she could not spell some of the words in the answers she wanted to put down. In *Allridge, supra,* the prospective juror did not fill out the juror questionnaire at all.) Henager stated that she could "read pretty good" and was a regular reader of her local paper, The Fort Worth Star Telegram. Henager admitted that there were some large words that she did not understand. But when questioned about the special issues she would face as a juror, Henager demonstrated an ability to grasp the meaning of those issues. (In *Johnson,* 773 S.W.2d at 332, the prospective juror could not demonstrate such an ability.) The voir dire indicates, as appellant concedes, that Henager was able to express herself in writing. *Hernandez v. State,* 506 S.W.2d at 887.

We find from the record sufficient evidence to support the trial court's decision that Henager met the literacy requirements of Art. 35.16(a)(11). Therefore, the trial court did not abuse its discretion in denying appellant's challenge of Henager for cause. Appellant's ninth point of error is overruled.

■ In his tenth point of error appellant complained the trial court abused its discretion by excusing venireperson Joseph Villemaire on the basis of potential economic hardship. Appellant contended that Villemaire's preoccupation with his business was not serious enough to warrant the trial court to grant the State's challenge of Villemaire for cause. We disagree.

During the course of his voir dire, Villemaire explained that his company recently made a major layoff of employees which reduced his staff down to a level "that is totally inconvenient and almost impossible to work with." When asked about his ability to deliberate and listen to the evidence, Villemaire responded that his "mind would be in other places." The State challenged Villemaire for cause because he would be "substantially impaired." Appellant was permitted an opportunity to rehabilitate Villemaire.

Appellant asked Villemaire if he had someone at the office who could manage the business in his absence. Villemaire responded there was an inside sales manager. He supposed it would be possible, but very difficult, to communicate with him through the bailiff. Appellant then asked, "Would that to some extent alleviate your concerns and allow you to focus—?" Villemaire responded, "Strictly on the basis of my own personality, I would say no." The trial court then interceded:

COURT: "I can understand that it will be difficult for you to concentrate on this case with your concerns about your business."

VILLEMAIRE: "Uh-hun."

COURT: "So I am going to grant the State's challenge for cause."

■ A challenge for cause can properly be asserted on grounds which are not specifically enumerated in Article 35.16, V.A.C.C.P., where such a challenge is based on facts that show that the prospective juror would be "incapable or unfit to serve on the jury." Art. 35.16(a), V.A.C.C.P.; *Nichols v. State,* 754 S.W.2d 185, at 193 (Tex.Cr.App.1988); *Moore v. State,* 542 S.W.2d 664, at 669 (Tex.Cr.App. 1976) cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). These challenges, which are not based upon any ground specifically enumerated in the stat-

utes, are ordinarily addressed to the sound discretion of the trial judge. *Nichols*, 754 S.W.2d at 193; and *Moore*, 542 S.W.2d at 669.

In *Nichols*, the prospective juror was properly subject to such a non-enumerated challenge for cause, because he was so preoccupied with personal problems that he was unfit to serve. *Nichols*, 754 S.W.2d at 193–194. In *Rogers v. State*, 774 S.W.2d 247 (Tex.Cr.App.1989), the prospective juror was also held to be properly subjected to such a non-enumerated challenge for cause because her preoccupation with family matters would keep her from giving the cause full attention. This supported the trial court's decision in *Rogers* that the prospective juror was unfit and subject to the State's challenge for cause. *Rogers*, at 253–254. See also, *Sosa v. State*, 769 S.W.2d 909 (Tex.Cr.App.1989); and *Henley v. State*, 644 S.W.2d 950 at 957 (Tex.App.—Corpus Christi, 1982) (pet. refused).

In the instant case, the record of the voir dire supports the trial court's conclusion that venireperson Villemaire's preoccupation with his business rendered him unfit for service on the jury because he would not give the instant cause his full attention. *Rogers*, 774 S.W.2d at 253–254; *Nichols*, 754 S.W.2d at 193–194; and *Moore*, 542 S.W.2d at 669. The trial court did not abuse its discretion in granting the State's challenge for cause of venireperson Villemaire.[4] Point of error ten is overruled.

■ In his eleventh point of error, appellant argued the trial court abused its discretion when it excused venireperson Sally Williams for cause. Appellant contended that Williams was not disqualified under any of the statutory reasons enumerated in Art. 35.16, V.A.C.C.P. Appellant also stated that it was an abuse of the trial court's discretion to excuse Williams for a non-enumerated reason. We disagree with appellant, and conclude that the record of

the voir dire of Williams supports the trial court's decision to grant the State's challenge for cause.

During the voir dire of Williams she explained that the possibility of sequestration represented a problem for her because of her domestic situation as a single parent. She had one child still living at home with her: a fifteen year old son. Though he didn't qualify as a minor child, Williams claimed there would be a problem because she could not make arrangements to care for her son in her absence, at least "not to the point where I can feel relaxed about it." This son was also involved in a legal matter, where Williams was going back to court to get her ex-husband's child support and custody orders modified. This matter was pending at the time of the instant trial.

Williams discussed with the State and appellant how this matter would interfere with her service as a juror in the instant case. She admitted to the State that this matter would prevent her from being a fair and impartial juror, and in giving this case "the type of attention that you would want to have if you were on trial." The State then challenged Williams for cause. Before the trial court ruled on the challenge, appellant attempted to rehabilitate the juror.

After appellant and Williams talked about how her son was partially the subject of the divorce order modification proceedings, appellant asked Williams:

APPELLANT: "Do you feel that you would be able to apply—follow any instructions that the Court would give you if you were called to sit as juror?"

WILLIAMS: "No, I don't."

APPELLANT: "And in particular, how would your ability to follow those instructions be affected?"

WILLIAMS: "Well, at this point, I just don't have a clear mind, you know, how

---

**4.** Appellant also argues in this point of error that the trial court should not have been permitted to use a non-enumerated challenge for cause to excuse a juror who would be objectionable to the State because of his doubts about the death penalty, yet who would qualify under *Adams* to serve on the jury. We note at trial there was no

voir dire at all of Villemaire on his opinions regarding the death penalty. There is nothing in the record of voir dire to support appellant's claim that Villemaire's opinions rendered him objectionable to the State, but qualified under *Adams*. This argument has not been preserved for review.

you can sit here but your mind is somewhere else and you really don't hear what is being said to you."

At this point, the State resubmitted its challenge of Williams for cause to the trial court. The trial court permitted appellant more questioning of Williams. Then the trial court asked Williams if her problem would prevent her from concentrating and giving her full attention to this case. Williams replied that it would. The trial court then granted the State's challenge of Williams for cause. Appellant objected on the following grounds: that Williams was being excused for a reason that was not enumerated in Art. 35.16, V.A.C.C.P.; and that she had not stated that she could not or would not follow any law upon which the State was entitled to rely. The trial court overruled this objection.

As discussed in point of error ten, the trial court may excuse a juror as unfit for service for a reason not set out within Art. 35.16, so long as the trial court does not abuse its discretion in granting the non-enumerated challenge. Art. 35.16(a), V.A.C.C.P.; *Nichols v. State*, 754 S.W.2d 185, at 193 (Tex.Cr.App.1988); *Moore v. State*, 542 S.W.2d 664, at 669 (Tex.Cr.App. 1976) cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). In the instant case, we find the record of the voir dire of Williams supports the trial court's decision that she was "incapable or unfit" to serve on the jury. *Nichols*, at 193; *Moore*, at 669; see also *Rogers v. State*, 774 S.W.2d 247 (Tex.Cr.App.1989).

In appellant's brief, he also argues that it was error for the State to not explain its strike of a minority member of the venire. Williams was an African–American. The State did not use a peremptory strike on Williams. Also, appellant did not raise this objection during the voir dire of Williams, or at the time the trial court granted the State's challenge for cause. This case was tried after the decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was handed down. If there was an error in this regard, appellant failed to preserve error and presented nothing for review. *Allen v. State*, 769 S.W.2d

563 (Tex.Cr.App.1989). Appellant's eleventh point of error is overruled.

In points of error twelve and thirteen, appellant argued the trial court erred when it excused venirepeople Betty Morgan and Melba Crittenden, respectively, for cause. Appellant argued that the trial court abused its discretion by granting the State's challenges for cause of Morgan and Crittenden because they said they were biased against probation as a penalty for murder. We find that the trial court did not abuse its discretion in granting the State's challenges pursuant to Art. 35.-16(b)(3), V.A.C.C.P.

During voir dire, venireperson Morgan repeatedly voiced her opposition to probation as a punishment for murder. Morgan stated that she didn't think appellant should get probation under any circumstances. Because she believed appellant should be punished "more than just probation," Morgan stated that she had a bias against the law. The trial court granted the State's challenge of Morgan over appellant's objection that this was "not a portion of the law that the State is entitled to rely upon."

During voir dire, venireperson Crittenden explained that it would be "very hard" for her to give appellant probation after he had been found guilty of murder, even if appellant proved himself eligible and applied for probation. When the State asked her if she "wouldn't give fair consideration to probation," Crittenden responded, "Huh-uh. No." Appellant attempted to rehabilitate Crittenden by asking if she would be able to "consider probation in a murder case, not necessarily a capital case that was reduced to murder, but just any murder case?" Crittenden answered, "No." The trial court granted the State's challenge for cause over appellant's objection that "probation law is not one that the State can in any rational definition of the term rely on."

Appellant grouped these two points of error for argument in his brief. Appellant claimed, as he did at trial, that these were not proper challenges under Art. 35.-16(b)(3), V.A.C.C.P., because probation is

"a uniquely defensive issue." Appellant asserted that probation is a law upon which the defense, and not the State, can rely. Appellant cited no authority in his brief in support of these arguments.

This Court has decided this issue adversely to appellant in past cases. See *Holloway v. State*, 691 S.W.2d 608 at 612 (Tex.Cr.App.1984), and the cases cited therein; cert. granted judgment vacated and cause remanded on other grounds 475 U.S. 1105, 106 S.Ct. 1508, 89 L.Ed.2d 908 (1986); judgment reversed on remand on other grounds 780 S.W.2d 787 (Tex.Cr.App. 1989), and the cases cited therein. *Holloway* involved a conviction for capital murder in which five venirepersons were excused on the State's challenge for cause due to their opposition to probation as a penalty for murder. This Court held that "the State's challenge was properly based on Art. 35.16, V.A.C.C.P., which provides for the challenge of a prospective juror who has a bias or prejudice against "any phase of the law upon which the State is entitled to rely for conviction or punishment." The court properly sustained the State's challenge." *Holloway*, at 612. In the instant case, we hold the trial court properly sustained the State's challenges for cause of Morgan and Crittenden pursuant to Art. 35.16(b)(3). Appellant's twelfth and thirteenth points of error are overruled.

In his fourteenth point of error, appellant argued that his sentence is invalid because the evidence was insufficient to support an affirmative finding to the second special issue. See Art. 37.071, V.A.C.C.P. We disagree and find the evidence was sufficient to support the jury's decision that there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

█ In resolving whether the evidence supports the jury's affirmative answer to the second special issue, we must look at all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

█ In the instant case, both appellant and the State presented evidence at the punishment phase of appellant's trial. The State requested that all evidence admitted at the guilt-innocence stage of the trial be admitted for the jury's consideration at punishment. The State proved that appellant committed several other unadjudicated acts after the commission of the instant offense.

On March 9, 1985, appellant participated in an aggravated robbery of customers and employees at a Pizza Hut restaurant in Fort Worth. During the course of that robbery, appellant held his pistol to a victim's cheek and stated, "Turn around or I shoot." On March 10, 1985, appellant took part in a robbery of employees and customers at an International House of Pancakes Restaurant in Fort Worth. Appellant used his pistol in that robbery to threaten the victims.

On the late evening of March 24, 1985, appellant, his brother and two accomplices took part in a series of aggravated robberies in Tarrant County. During the first three aggravated robberies, appellant's brother drove and his accomplices remained in the car. In each offense, appellant entered the store or restaurant alone and robbed at gunpoint the employee at the register. Each time, appellant would act as if he wanted to make a purchase, wait until the employee opened the register, and would then rob them. First, appellant committed a robbery at a submarine sandwich shop. Then he committed a robbery at a Fina service station. Lastly, he committed a robbery after midnight in the early morning hours of March 25, 1985 at a Pizza Inn.

Later, appellant got behind the wheel of the car to drive while his brother and two accomplices robbed the customers and employees at the Whataburger Restaurant on Sycamore School Road in Fort Worth. During the course of that robbery, appel-

lant's brother shot and killed a customer.[5] Appellant remained outside in the car and drove his brother and accomplices away from the scene.

After the Whataburger robbery, at approximately 4:00 a.m., appellant entered a Zippy Food Store in Fort Worth. Appellant used his pistol to rob the cashier. As he was leaving the store, appellant stated to the clerk, "Have a nice day."

In his defense at the punishment phase of his trial, appellant attempted to prove that it would not be probable that he would commit crimes of violence in the future. Appellant presented evidence that he had been a good kid when he was growing up. Appellant proved that he graduated from high school. Appellant showed that he had been intimidated and dominated by his brother, Ronald Allridge. Appellant called a psychologist to testify that appellant was intelligent and competent, and that he was not psychotic or sociopathic. The psychologist testified that, in his opinion, if appellant was away from his brother, appellant would not be a threat to commit violent acts in the future. On cross-examination, the psychologist acknowledged that his opinion was based upon a two-hour interview with appellant that occurred 33 days before he testified. The psychologist also acknowledged that appellant and his brother had taken up the nicknames "icecube" and "iceberg", respectively.

■ This Court has held that the facts of the crime alone as proven during the first stage of the trial can be sufficient to support affirmative findings to the special issues at the punishment stage of a capital murder trial. *O'Bryan v. State*, 591 S.W.2d 464, at 480 (Tex.Cr.App.1979); *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App. 1983) cert. denied 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984); *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986) cert. denied 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 407 (1987); *Anderson v. State,* 717 S.W.2d 622, at 634 (Tex.Cr.App.1986); *Drew v. State,* 743 S.W.2d 207 (Tex.Cr.App.

1987); *Sosa v. State*, 769 S.W.2d 909, at 912 (Tex.Cr.App.1989); and *Valdez v. State*, 776 S.W.2d 162, at 166 (Tex.Cr.App. 1989). The circumstances of the crime may provide greater probative evidence of a defendant's probability for committing future acts of violence than any other relevant to the second special issue. E.g., *O'Bryan v. State, supra.*

The facts in the instant case show the calculated nature of appellant's acts and the forethought with which he coldly carried out those acts. Appellant killed Brian Clendennen after the robbery of the Circle K store had been completed, and he was ready to make his exit. Appellant's actions in binding the victim's hands, kneeling him down on the floor of the storeroom, and shooting him in the back of the head reflect nothing less than an execution. When appellant was safe in his get-away car, he noticed his gun had jammed on a second shot and he attempted to return to the store to make certain that his victim was dead. Of all of the solo robberies carried out by appellant, Clendennen was the only victim that he killed. Clendennen did not provoke appellant's actions. The only threat Clendennen represented to appellant was that he knew appellant's identity. It would be reasonable for the trier of fact to conclude that appellant killed Clendennen to save himself from arrest and prosecution. This cool calculation of appellant is probative evidence of his propensity to commit future acts of violence. *Turner v. State*, 698 S.W.2d 673, at 676 (Tex.Cr.App. 1985); *Anderson v. State*, 717 S.W.2d at 634; and *Valdez v. State*, 776 S.W.2d at 167; see, also, *O'Bryan v. State*, 591 S.W.2d at 480, and cases cited therein.

The facts of the instant case also reveal the remorselessness of appellant after the murder of Clendennen was carried out. Appellant continued robbing victims at fast food restaurants and convenience stores over a two month period until he was caught. On the morning after the Whataburger robbery-murder and the other hold-

---

**5.** See *Allridge v. State*, 762 S.W.2d 146 (Tex.Cr. App.1988), in which this Court affirmed the capital murder conviction and death sentence of appellant's brother for the Whataburger Restaurant robbery-murder.

ups, appellant made a court appearance to pay his attorney to file a motion for continuance on a pending third degree felony theft prosecution. Later that morning, just before his arrest, appellant paid his back rent and utilities in cash, ostensibly with proceeds of the previous evening's robberies. The facts here reveal a wanton and callous disregard for human life, and also establish that appellant had a propensity to commit future acts of violence. *O'Bryan v. State*, 591 S.W.2d at 481; *Williams v. State*, 668 S.W.2d 692, at 696 (Tex.Cr.App.1983); and *Turner v. State*, 698 S.W.2d at 676.

Evidence at trial also showed appellant committed extraneous offenses. Appellant committed seven other aggravated robberies after the instant offense and before his arrest, four in which he entered the store or restaurant armed and alone to carry out the robberies, two in which he was one of several robbers in a restaurant, and robbery-murder at Whataburger. The facts also indicate a propensity to commit acts of violence in the future. *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984); *Anderson v. State*, 717 S.W.2d at 634; and *O'Bryan v. State*, 591 S.W.2d at 480, and cases cited therein. The fact that appellant committed these actions after the instant offense does not diminish a conclusion that they are probative of appellant's predisposition to violence. *Davis v. State*, 597 S.W.2d 358 (Tex.Cr.App.1980); and *Anderson v. State*, *supra*.

Appellant argued that his evidence proved that his actions were the result of being dominated by his older brother. Appellant also emphasized that the testimony of his psychiatrist showed that apart from his brother, he would not represent a continuing threat to society. Appellant relied upon *Roney v. State*, 632 S.W.2d 598 (Tex. Cr.App.1982) to support his argument that he would not be predisposed to violence in the future. We do not agree with appellant.

We find *Roney v. State* to be distinguishable on the facts. In the instant case, appellant exhibited a repeated course of criminal conduct. While in *Roney v. State*, the defendant was shown only to possess a "single criminal purpose with two successive targets." *Roney v. State*, 632 S.W.2d at 603. Second, appellant's argument that he was dominated by his brother was rebutted by the State's evidence that he entered the Circle K store alone when he shot Brian Clendennen. He also entered four other stores alone to pull aggravated robberies. As for the psychologist's testimony, the jury's verdict reflects that they believed the State's evidence balanced out that mitigating psychological evidence. *Jordan v. State*, 707 S.W.2d 641 (Tex.Cr. App.1986).

All of these factors, appellant's cool and calculated approach to the commission of these crimes, his lack of remorse and disregard for human life, and the extraneous offenses, lead us to conclude that the factfinder in the instant case had sufficient evidence before it to decide beyond a reasonable doubt that appellant represented a continuing threat to society. *Williams v. State*, 668 S.W.2d 692 (Tex.Cr.App.1983). Appellant's fourteenth point of error is overruled.

■ In his fifteenth point of error, appellant argued that his conviction was invalid because of his allegedly unlawful warrantless arrest on March 25, 1985. Appellant was not arrested in connection with the instant offense, but instead for his involvement in the robbery-murder at the Whataburger Restaurant on Sycamore School Road in the early morning of March 25. The police had a warrant for the arrest of appellant's brother, Ronald, for the Whataburger robbery-murder. They arrested appellant without a warrant when they executed the warrant for his brother's arrest at the apartment which they shared.

Appellant believed, for the following reasons, that his warrantless arrest was not justified under any of the following provisions: Art. 14.01[6] (the Whataburger of-

---

6. Art. 14.01(a), V.A.C.C.P., sets out:
"A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace."

fense was not committed within the view or presence of the arresting officers), 14.03 [7] (the appellant was not arrested in a suspicious place or under circumstances that would indicate he was guilty of some felony), or 14.04 [8] (there was no indication that appellant would run before a warrant for his arrest could be secured). We disagree with appellant's reasoning, and hold that his warrantless arrest was valid. A review of the facts of the arrest is necessary.

Detective Paul G. Kratz was called in to investigate the Whataburger robbery-murder in the early morning hours of March 25, 1985. A young woman was dead with "a large hole in her chest." Witnesses at the scene said she had been killed with a shotgun. They also said there had been three robbers, all armed: one with a shotgun, one with a .25, and one with a small calibre revolver. Kratz found a spent .25 calibre shell on the floor near the counter. One of the witnesses at the scene identified Ronald Allridge as being the robber with the shotgun. Kratz located Ronald Allridge's home address from an offense report in an unrelated crime. Kratz also obtained a description of the car used by the robbers to leave the scene. At this time, outside of their general descriptions provided by witnesses at the scene, Kratz did not know the identities of the other robbers in the Whataburger robbery-murder. He sent two officers out to watch the apartment while he secured an arrest warrant for Ronald Allridge.

Detective J.J. Yale was assigned by Kratz to set up surveillance at Ronald Allridge's apartment complex. Kratz alerted him to watch for a suspect vehicle, and to watch the entrance to apartment 101. At approximately 10:30 a.m., Yale saw the suspect vehicle being driven up to the apartment complex. The driver got out and went into apartment 101. At the suppres-

sion hearing, Yale identified appellant as being the driver of the suspect vehicle.

Yale then went to the apartment complex manager's office to ask her about the identities of the residents of apartment 101. While Yale was there, appellant walked in to pay the back rent and utilities on Apartment 101. The manager told Yale and his partner that James Vernon Allridge, appellant, was the man who paid the rent. As they walked back to their car, they passed the suspect vehicle which they'd seen appellant drive. Yale saw in the back seat the barrel of a shotgun sticking out from under a sheet. Yale and his partner went back to their car to wait for Kratz to arrive.

When Kratz arrived a few minutes later with the arrest warrant for Ronald Allridge, he brought several other officers with him. Yale told Kratz that a man named James Vernon Allridge paid the rent on apartment 101. Yale assisted Kratz in making the arrest at apartment 101. Tony Rogers, a black male, answered the door. He was placed under arrest for capital murder. The officers found Ronald Allridge in bed in one of the two bedrooms. Kathy Jarmon was with him. Ronald Allridge was placed under arrest for capital murder. Kathy Jarmon was not arrested. Across the hallway from Ronald Allridge's bedroom was the apartment's second bedroom.

The officers determined that a third man, appellant, was in the bathroom off of that bedroom. Kratz had to move at least three feet into the second bedroom to get on the other side of the door that entered the bathroom. Kratz saw a small chrome pistol, apparently a .25 calibre semi-automatic, on a nightstand next to the bed. After a few minutes, appellant agreed to come out of the bathroom. Kratz placed him under arrest for capital murder.

---

7. Art. 14.03(a)(1), V.A.C.C.P., sets out:

"Any peace officer may arrest, without warrant: persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws."

8. Art. 14.04, V.A.C.C.P., sets out:

"Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused."

The three men who had been arrested[9] were placed face down on the floor in the living room. All three men received Miranda[10] warnings from the arresting officers. Kratz then took appellant outside, down to appellant's car, to talk with him. Kratz showed appellant a consent to search form. He advised appellant of his right to refuse the search. He again advised appellant of his rights. Appellant read the consent form, claimed to understand it, and had no questions regarding it. At trial Kratz testified:

"I had a consent to search form with me and I explained the form to him and told him that I was looking for evidence of the murder that had occurred earlier that morning at the Whataburger restaurant, and asked him to give me consent to search his car and his room inside of the apartment."

Kratz also testified that appellant was not physically abused in any way. Kratz explained that appellant was continuously in his presence up until the signing of the consent, and that no promises were made to appellant. Appellant signed the consent to search form. Kathy Jarmon had earlier signed a consent to search form for the rest of the apartment.

Kratz called in Officer B.R. Patterson to conduct an evidentiary search of the apartment. Patterson recovered the .25 calibre pistol from appellant's bedroom, and another .25 calibre pistol from another part of the apartment. Patterson also recovered a shotgun from the Chevy.

Kratz had not been assigned to investigate the instant case, the Circle K convenience store robbery-murder. However, while interrogating Ronald Allridge, Kratz learned that appellant had been involved in the instant offense. At that point, Kratz contacted Det. D.F. LaRue, who had been assigned to the Circle K case. LaRue interrogated appellant in regards to the instant case on March 26, 1985.

■■■■ Appellant claims that his warrantless arrest was invalid. "The constitutional validity of a warrantless arrest or search can only be decided in terms of the concrete factual situation presented by each case," *Pyles v. State*, 755 S.W.2d 98, at 109 (Tex.Cr.App.1988). In the process of analyzing a warrantless arrest, it is the combination of factors that constitute a reasonable conclusion that there is probable cause to make an arrest without a warrant: the information that a crime has been committed, the knowledge by the arresting officers of the facts of the crime, the observations of the arresting officers, and the arresting officers' basis for believing that a suspect would take flight if not placed in custody. *Pyles v. State, supra.*

■■■■ In determining whether an officer could reasonably have believed that a suspect would take flight, it is important to keep in mind the "temporal proximity" of the actions of a suspect both to the commission of the crime, and to the suspect's discovery of the police investigation of him. *Dejarnette v. State*, 732 S.W.2d 346, at 352 (Tex.Cr.App.1987).

In the instant case, Det. Kratz had satisfactory proof that a robbery-murder had been committed by three men, one was armed with a shotgun and another was armed with a .25 calibre pistol. Kratz also had satisfactory proof that appellant's brother had been identified as the shooter, that appellant had driven up to his and his brother's residence in a vehicle which matched the description of the Whataburger getaway car, that a shotgun was in the

---

**9.** When Kratz had been at the Whataburger, the witnesses generally described the three robbers as all being black males. Most of the witnesses described the robber with the shotgun as being over six feet tall. The witnesses were not able to recall which of the other two robbers had been carrying the .25. At the suppression hearing, Kratz testified on cross-examination that one of the witnesses, Charles Williams, recalled that one of the two non-shotgun carrying robbers was also over six feet tall. This roughly matched appellant's physical description. Kratz also admitted on cross that after his investigation of the Whataburger case was completed, he presented Ronald Allridge, Raymond Jarmon and Clarence Jarmon to the Grand Jury as the gunmen, while appellant was presented to the Grand Jury as the driver in that case.

**10.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

back seat of that vehicle after appellant got out; that a .25 calibre semi-automatic pistol was found in appellant's bedroom in the apartment he shared with his brother, and that appellant matched a general description of one of the robbers. When Kratz arrested appellant's brother, he found appellant hiding in one of the bathrooms. Kratz found all of this within hours of the commission of the robbery-murder. Considering these factors, especially the close proximity in time of the apprehension to the crime itself, in addition to appellant's attempt to hide from the police in the bathroom, we find these facts were sufficient for the officer to conclude that the appellant would take flight and that procuring a warrant was impractical. *Dejarnette v. State, supra; Pyles v. State,* 755 S.W.2d at 109; and *Fearance v. State,* 771 S.W.2d 486, at 509 (Tex.Cr.App.1988) cert. denied, 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989). But cf. *Stanton v. State,* 743 S.W.2d 233 (Tex.Cr.App.1988) (where the defendant did not know his cohorts had been apprehended or that his residence was staked out by the police). We find under the facts of the instant case that appellant's warrantless arrest was valid under the provisions of Art. 14.04, V.A.C.C.P. Appellant's fifteenth point of error is overruled.

■■■ In point of error sixteen, appellant argued the trial court erred when it denied appellant's first amended motion to suppress illegally obtained evidence, thereby admitting into evidence the .25 calibre handgun recovered from the nightstand of appellant's bedroom.

Initially, appellant claimed that the seizure of the handgun was tainted by his illegal warrantless arrest. In the preceding point of error we found appellant's warrantless arrest to have been valid. Therefore, this did not taint the seizure of the handgun. Secondly, appellant claims the State failed to meet its burden of proving that he voluntarily consented to the search of his bedroom, because the testimony conflicted over whether or not appellant voluntarily signed the consent to search. As pointed out on the previous point of

error, Det. Kratz testified that appellant was not physically abused or coerced to sign the consent. Kratz testified that no promises were made to appellant to get him to sign the consent. Kratz also testified that he warned appellant of his right to refuse to consent and fully explained the consent form to him. Kratz stated that appellant acknowledged that he understood both his rights and the consent to search form before he signed it.

In contrast, appellant presented evidence at the suppression hearing to establish that he was physically and psychologically coerced into signing the consent to search his bedroom. This evidence consisted of appellant and his brother's testimony about what occurred at their apartment after they were arrested. Appellant and his brother testified that Kratz asked appellant if he wished to consent to a search of the premises and appellant refused. Appellant and his brother testified that Kratz then used his foot to force appellant's head to the floor, and subsequently "jerked" appellant off the floor and took him outside. Appellant testified that once he was outside, Kratz told him that they could do this the hard way or the easy way, that appellant could make him spend three or four hours getting a search warrant, or he could go ahead and sign. Appellant testified that if not for this treatment and these statements, he would not have signed the consent to search. The trial court overruled appellant's motion to suppress.

■■■ A trial court has broad discretion in determining the admissibility of the evidence, and an appellate court will not reverse unless a clear abuse of discretion is shown. *Williams v. State,* 535 S.W.2d 637 (Tex.Cr.App.1976). The trial judge is the sole fact finder at a hearing on a motion to suppress evidence obtained in a search, and may choose to believe or disbelieve any or all of a witness' testimony. *Clark v. State,* 548 S.W.2d 888, at 889 (Tex.Cr.App.1977); *Luckett v. State,* 586 S.W.2d 524, at 527 (Tex.Cr.App.1979); *Taylor v. State,* 604 S.W.2d 175, at 177 (Tex.Cr.App.1980); and *Hamilton v. State,* 621 S.W.2d 407, at 410 (Tex.Cr.App.1981). Here, the trial court

chose to believe Det. Kratz, and disbelieve appellant and his brother.

The State must show by clear and convincing evidence that appellant's consent was freely and voluntarily given. *Dickey v. State*, 716 S.W.2d 499, at 504 (Tex.Cr.App.1986). The consent must be shown to be positive and unequivocal, and there must not be any duress or coercion. *Meeks v. State*, 692 S.W.2d 504, at 509 (Tex.Cr.App.1985). The showing that a suspect has been warned that he does not have to consent to the search and has a right to refuse is of evidentiary value in determining whether a valid consent was given. *Meeks v. State*, 692 S.W.2d at 510.

In the instant case, we observe that the *Miranda* warnings were given to appellant before he signed a consent to search. Appellant was also clearly apprised of the fact that he had the right to refuse to sign the consent to search. This fact was apparent on the face of the consent to search form which appellant signed. Appellant read and signed the consent to search form. There was sufficient testimony in the record to support the trial court's implied decision that appellant was not coerced or threatened into giving his consent. We find the consent was voluntary. *Reyes v. State*, 741 S.W.2d 414, at 431 (Tex.Cr.App. 1987). The evidence complained of was properly admitted into evidence. Appellant's sixteenth point of error is overruled.

Appellant argued in his seventeenth point of error that the trial court erred in denying his motion to suppress his confession. Appellant's argument is premised on the arguments that his warrantless arrest was invalid (point of error fifteen), that the police committed acts of misconduct in coercing his consent to search (point of error sixteen), and that this taint was not removed from his confession. This Court has already decided that appellant's warrantless arrest was valid, and that the record supports the trial court's conclusion that appellant's consent was freely and voluntarily given, and not coerced. There was

no taint to be removed, and no need for any attenuation analysis by this court.[11]

Detective LaRue testified at the suppression hearing concerning his taking appellant's confession on March 26, 1985. LaRue testified that he gave appellant his *Miranda* warnings before they began the interrogation. Appellant initialed each one as LaRue read them to him. At one point during the interrogation, the police typewriter broke down. LaRue testified that appellant fixed the typewriter so that they could continue. LaRue stated that he did not threaten or coerce appellant to secure the confession. Appellant did not invoke any of his rights. LaRue read the confession to him, and appellant signed it. We conclude that appellant voluntarily and knowingly confessed. *Bell v. State*, 724 S.W.2d at 793. There was no taint to be removed from the confession. Appellant's seventeenth point of error is overruled.

In his eighteenth point of error, appellant argued that the trial court erred when it admitted, over his objection, an inflammatory photograph of an extraneous homicide during the penalty phase of the trial. During the testimony of Detective Kratz, he described the scene which he observed at the Whataburger restaurant where the March 25th robbery-murder occurred. In the statement which he gave to Detective LaRue, appellant confessed that he took part in the commission of the Whataburger offense.

During Kratz's testimony, the State showed him a photograph of the table where the victim had been sitting when she was shot. In his brief, appellant states this photograph displayed "graphic depictions of blood stains and blood pools." Kratz testified that the photograph truly, accurately, and fairly depicted and portrayed the interior of the Whataburger store "as it existed on the early morning hours of March 25, 1985." When the State offered the photograph into evidence, appellant objected that it was "inflammatory in nature

11. For an example of attenuation analysis, see *Bell v. State*, 724 S.W.2d 780, at 788–792 (Tex.Cr. App.1986).

and the inflammatory nature of it out-weighs its probative value." The trial court overruled appellant's objection to the photograph and admitted it into evidence.

In his brief, appellant contended that it was an abuse of discretion for the trial court to admit this photograph because: appellant "had no direct involvement with" that offense, the photograph was grue-some, the photograph was in color, and the photograph was cumulative (one of four photographs depicting that crime scene). The State responded in its brief that the trial court did not abuse its discretion in admitting the photograph because it was a fair and accurate depiction of the crime scene as observed by the investigating de-tective, and appellant was directly involved in that crime, even though he was not the shooter.

"The admission into evidence of photographs is within the discretion of the trial court, who determines whether they serve a proper purpose in the enlighten-ment of the jury." *Burdine v. State*, 719 S.W.2d 309 (Tex.Cr.App.1986), cert. denied 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987), and cases cited therein. A photo-graph will usually be admissible so long as a verbal description of what it depicts is also admissible. *Barefield v. State*, 784 S.W.2d 38 (Tex.Cr.App.1989); *Williams v. State*, 773 S.W.2d 525 (Tex.Cr.App.1988); and *Burdine v. State*, 719 S.W.2d at 316. "Only where the probative value of the photograph is small, and the inflammatory potential great, will it be an abuse of dis-cretion to admit the photograph." *Williams v. State*, 773 S.W.2d at 539; and *Burdine, supra.*

Here, the photograph depicts the scene of the crime, the location of the victim, and the effects of the attack upon her. They are probative of the fact and manner of the victim's death. A verbal description of the crime scene was admissible. This Court is convinced that the probative value of the photograph was not outweighed by any prejudicial effect it might have had. *Bare-field v. State*, 784 S.W.2d at 46; *Williams, supra;* and *Burdine, supra.* Appellant's eighteenth point of error is overruled.

In appellant's nineteenth point of error, he argued that it was error for the trial court to refuse to grant his requested instruction to require the jury to consider the effect, if any, of appellant not receiving the advice of counsel during his interroga-tion. Appellant stated that when he was arrested by Detective Kratz and taken to jail on March 25, 1985, he asked the jailers if he could use the phone. He did not indicate who he wanted to call or the rea-son for the call. The jailers told him to wait till he saw the detectives. Appellant contended that this evidence raised the is-sue of his right to counsel prior to and during his questioning by the detectives. Consequently, appellant argued, the jury should have been instructed to determine that issue when assessing the weight and credibility to be given to his confession.

The State responded that appellant has not proved an error by the trial court, since there was no evidence admitted at trial that appellant at any time requested the assis-tance of counsel after his arrest. In fact, the testimony at trial indicated that appel-lant never made any such request from the time that he was arrested through the giv-ing of his confession to Detective LaRue. The State argued that appellant's general request to make a phone call did not rise to the level of being a request for counsel. After reviewing the record, this Court agrees with the State's assessment of the facts of the instant case.

Because the evidence at trial did not raise the issue of advice of counsel during interrogation, appellant was not entitled to his requested instruction. *Wagner v. State*, 687 S.W.2d 303, at 307 (Tex.Cr.App. 1984). Appellant's nineteenth point of er-ror is overruled.

In his twentieth point of error, ap-pellant argued that his death sentence is invalid because it is based on Art. 37.071, V.A.C.C.P., which fails to allow jurors to consider and apply mitigating factors in determining punishment and is, therefore, unconstitutional. In this point, appellant urged that 37.071 is facially unconstitution-al. Appellant does not argue that 37.071

was unconstitutionally applied to him or to any mitigating evidence that may have been presented at his trial. Compare *Black v. State*, 816 S.W.2d 350 (Tex.Cr. App.1991), rehearing denied on July 3, 1991; *Ex Parte Ellis*, 810 S.W.2d 208 (Tex. Cr.App.1991); and *Ex Parte Baldree*, 810 S.W.2d 213 (Tex.Cr.App.1991). (In which the applicants argued that the 37.071 instructions given at their trials prevented their juries from considering and giving effect to their mitigating evidence.)

At trial, appellant did not request an instruction on mitigating evidence (for example, a request for a third special issue for the jury to grant mercy to a defendant in light of mitigating circumstances). He made no objection [12] that the special issues submitted to the jury did not permit them to consider any mitigating evidence he may have presented. Appellant did not argue in his brief that he would have been entitled to an instruction on mitigating evidence pursuant to the evidence which he admitted during the punishment phase. Appellant does not argue that his counsel made a decision that, in light of the decisions of this Court [13], any such actions on behalf of appellant would have been futile.

 As in *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988) and in *Kinnamon v. State*, 791·S.W.2d 84 (Tex.Cr.App.1990), appellant has not complained the trial court denied him the opportunity to present mitigating evidence, or that the jury was instructed to ignore mitigating evidence. Instead, appellant only argues that Article 37.071 is facially unconstitutional. "Vicarious constitutional arguments, without support in the record, are not properly before this Court on appeal." *Kinnamon v.*

*State*, 791 S.W.2d at 94. Article 37.071 is not unconstitutional on its face. *Franklin v. Lynaugh, supra;* and *Kinnamon, supra.* Appellant's twentieth point of error is overruled.

 In his twenty-first point of error, appellant argued that the trial court erred when it denied appellant the opportunity to present a bill of exceptions for review during the pre-trial hearing on the motion to suppress his confession. During that hearing, appellant presented evidence from Fort Worth Municipal Judge Yolanda Bernal, who gave appellant the magistrate's warnings pursuant to Article 15.17(a), V.A.C.C.P. on March 25, 1985. Appellant sought to question Judge Bernal on her practice in light of a defendant asking for a lawyer at that point "with respect to giving them an opportunity to make a phone call." The trial court sustained the state's objection to this line of questioning, because he was "having trouble seeing where it's relevant. This defendant testified that he did not ask the Judge for a lawyer." Appellant requested to make a bill of exceptions on this line of questioning. The trial court granted that request.

During perfection of his bill, Judge Bernal described the practice of her office dealing with a defendant's request for a phone call to speak with a lawyer. Appellant asked Judge Bernal if she was familiar "with Article 15.17." Appellant then handed her a copy of the statute to read. The State objected to this line of questioning. The trial court overruled the objection. Appellant asked Judge Bernal to look at the last sentence of paragraph (a) of Article 15.17.[14] Appellant asked her if she was familiar with that sentence. Judge Bernal responded "yes". Appellant asked her if

---

**12.** This Court has held that prior to the Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), an appellant does not need to object at trial in order to argue on appeal that the jury instructions at punishment prevented the jury from considering and giving effect to the mitigating evidence introduced at his trial. See *Black v. State*, 816 S.W.2d 350; *Ex Parte Ellis*, 810 S.W.2d 208; and *Ex Parte Baldree*, 810 S.W.2d 213. But that is not what appellant has argued in this point of error of his appeal.

**13.** See *Black v. State*, 816 S.W.2d 350 (Tex.Cr. App.1991). The instant case was tried in March of 1987.

**14.** At that time, the last sentence of Art. 15.17(a) set out:

"The magistrate shall allow the person arrested reasonable time and opportunity to consult counsel and shall admit the person arrested to bail if allowed by law."

the statute said an arrested person shall be allowed reasonable time and opportunity to consult counsel. Judge Bernal answered "yes".

Then, appellant asked Judge Bernal, "Were you aware of that section of the article at the time that you were giving warnings back in March of 1985?" The trial court interrupted, sustaining the state's objection. Appellant asked if the trial court was not permitting him to get that answer on the bill of review. The trial court responded, "She testified to what she did." The trial court did not permit appellant to get an answer to that question. Appellant stated that he had no further questions. He did not proffer to the court, orally or in writing, what he expected Judge Bernal's answer to have been.

Appellant argued in his brief that this specific question and answer were relevant to the credibility of Judge Bernal. Her credibility, according to appellant, was important to the question of appellant's consultation with an attorney prior to giving his confession. The State responded that the question about Judge Bernal's practice in general during March of 1985 was irrelevant in that it had nothing to do specifically with appellant's case. The State also argued that if the trial court erred, it was not reversible because there was no showing of harm in light of the testimony of Judge Bernal's bailiff and appellant that appellant did not request her to appoint an attorney, or to let him call an attorney.

■ In *Spence v. State*, 758 S.W.2d 597 (Tex.Cr.App.1988), this Court stated that "the right to make an offer of proof or perfect a bill of exceptions is absolute." This Court remanded the cause in *Spence* in order for the trial court to perfect the record so that this Court could review appellant's claim on appeal.

The instant case is distinguishable from *Spence* by the fact that appellant was permitted to make a bill of exceptions on Judge Bernal's familiarity with Art. 15.17, and the usual practice of her court in ad-

ministering magistrate's warnings. During the course of perfecting that bill, appellant was permitted to ask Judge Bernal if she was aware of the critical section of Art. 15.17(a). The trial court permitted Judge Bernal to respond. Appellant's question that he was not permitted to get answered was merely repetitive of the previous question which had been answered.

Also, in *Spence* the trial court's actions barred appellant from perfecting the record on his claim of Fifth and Fourteenth Amendment pre-indictment delay. *Spence v. State*, 758 S.W.2d at 598. In the instant case, the trial court's denial of appellant securing an answer to a repetitive question did not prevent him from preserving for review the issue of whether or not Judge Bernal was familiar with the statutory procedures for the administration of a magistrate's warning. The trial court's actions did not prevent appellant from preserving the record for review of his claim that his confession was involuntary.

We note that Tex.R.App.Pro.Rule 52, governing bills of exception, controls in the instant case.[15] If appellant believed that the answer he sought from Judge Bernal was critical to his claim of involuntariness, he could have taken the step provided in Rule 52(b) of making "an offer of proof in the form of a concise statement." Tex. R.App.Pro.Rule 52(b). In that way, he could have set out for the trial court what answer he expected to receive from Judge Bernal. Appellant failed to do this. Cf. *Hurd v. State*, 725 S.W.2d 249, at 252 (Tex.Cr.App.1987); and *Moosavi v. State*, 711 S.W.2d 53, at 55 (Tex.Cr.App.1986). Appellant's twenty-first point of error is overruled.

■ Appellant also raises four points of error in a pro se supplemental brief. Appellant has no absolute right to hybrid representation, and we therefore do not address these additional points. *Scarbrough*

---

**15.** The effective date of Rule 52 was September 1, 1986. The suppression hearing in the instant case was held in January 1987.

*v. State*, 777 S.W.2d 83, at 92 (Tex.Cr.App. 1989).

The judgment is affirmed.

BAIRD and MALONEY, JJ., concur in the result.

CLINTON, J., dissents.