IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,663




 


ABEL REVILL OCHOA, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM DALLAS COUNTY





 

 Hervey, J., delivered the opinion of the Court in which Meyers, Price,Womack,
Keasler, and Holcomb, JJ., joined. Keller, PJ., concurs in point of error one and
otherwise joined the opinion of the court. Johnson and Cochran, JJ., concurred.


 

O P I N I O N



 A jury convicted appellant of capital murder. The trial court sentenced appellant to death
pursuant to the jury's answers to the special issues submitted at the punishment phase. Appellant
raises five points of error. We affirm.

 In point of error two, appellant claims that the evidence is legally insufficient to support the
jury's affirmative answer to the future dangerousness special issue. See Article 37.071, Section
2(b)(1), Tex. Code Crim. Proc. This claim requires the Court to view all of the evidence in the
light most favorable to the verdict and determine whether a rational trier of fact could have found
beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of
violence that would constitute a continuing threat to society. See Jackson v. Virginia, 443 U.S. 307,
319 (1979); Allridge v. State, 850 S.W.2d 471, 487 (Tex.Cr.App. 1991), cert. denied, 510 U.S. 831
(1993).

 The evidence shows that on Sunday, August 4, 2002, appellant shot his wife, two of his
sisters-in-law, his father-in-law, and his 18-month-old daughter. Appellant reloaded his gun and shot
his seven-year-old daughter. This occurred in the home where appellant lived with his wife, his two
daughters, and his father-in-law. Everyone was killed except for one of the sisters-in-law (Alma)
who testified at appellant's trial that appellant looked "[v]ery mean, very angry" when the shooting
began.

 Q. [PROSECUTION]: Are you able to look at his face when he starts shooting?


 A. [ALMA]: Yes.


 Q. What's the expression on his face?


 A. Very mean, very angry, yes-


 [THE REPORTER]: I'm sorry? Very mean-


 A. Yes. Angry, yes.


 Q. Does he look like he's crazy, or does he look like he's mad?


 A. He looks like he's mad.


 Appellant and his wife were married in December 1993. Their first daughter (Crystal) was
born in November 1994. Appellant bought the murder weapon in December 1995 for home
protection. The relationship between appellant and his wife changed in August 1997 when appellant
found out that his wife had another child (Jonathan) out of wedlock before they met. This caused
appellant and his wife to separate for about six months. The prosecution presented evidence that
appellant threatened to shoot his wife during this separation. Alma testified that appellant became
"more aggressive" and "more mean" to his wife after appellant found out about Jonathan. Appellant
testified at the punishment phase that he had put the Jonathan issue behind him by the time he
murdered his family.

 About four months before the murders, appellant walked away from what many would
consider a good job that appellant had kept for about eleven years. Appellant had been addicted to
crack cocaine for about two years when this happened. Appellant's addiction to crack cocaine was
causing great stress in his marriage. When the police arrested appellant in his car very soon after the
murders, appellant told the arresting officer that he "couldn't handle the stress anymore."

 Q. [PROSECUTION]: What?


 A. [OFFICER COX]: I asked him where was the gun-I said-or where was the gun
at.


 Q. And why did you ask him that?


 A. To make sure it wasn't-he hadn't thrown it out the window, make sure it wasn't
like a threat to somebody if it was thrown out of a window, or in the shopping center
somewhere.


 Q. And did he respond to that question?


 A. Yes, he did.


 Q. What did he say?


 A. He said, It's at my house on the table.


 Q. What else did he say?


 A. Right after he said, It's at the house on the table, he said he-I couldn't handle the
stress anymore.


 Q. And what did he say about-did he make any comment about his life?


 A. Maybe a minute later he said something like, I got tired of my life.


 Soon after his arrest, appellant gave the police a written statement which was admitted into
evidence at appellant's trial. Appellant stated:

 I live at [address] with my wife and two daughters. My wife's father also lives with
us. I have had a drug problem for about two years. About two months ago I spent
two months in a drug rehab house. Before I went to the drug rehab house I was using
crack cocaine about once every three to four days. When I came out I was using the
drug only once every seven to ten days. Today, I went to church with my wife and
daughters. We left church at about 2:00 p.m., and I asked my wife if I could have ten
dollars to buy a dime bag of crack. At first, she did not want to give it to me, but I
talked her into it. I drove my wife and daughters to the dope house, and I went in and
bought a dime bag of crack. When we got home, I went into the back yard and
smoked the crack. While I was in the back yard, my wife's two sisters, Jackie and
Alma came over. They all stayed in the living room and talked. After I smoked the
crack I went into my bedroom, and laid down on the bed. I had the television on but
I did not pay any attention to it. While I was lying on the bed my body started
wanting more crack. I knew if I asked my wife for more money to buy some more
crack she wouldn't let me have it. I knew she would argue with me about the money,
just like we did in the past. I got up and went to my closet and I got my Ruger 9mm
gun. The gun was already loaded and I walked into the living room where my family
was. I started shooting while they were all sitting on the couch. I don't remember
who I shot first, but I ran out of bullets. I went back into the bedroom, and got
another clip and I walked back into the living room. When I came back into the
living room my daughter Crystal saw me with the gun and she started running away. 
I chased after her and I shot her. After I shot Crystal I went back into the bedroom
and got my wife's small plastic purse. I got into my car and I drove over to the
Wynnewood Shopping Center. I tried to get some money from an ATM machine, but
I didn't have the right code. I did not know where I was going to go, so I drove out
of the shopping center onto Zang and then I drove back into the shopping center
where the police stopped me.


 Appellant testified at the punishment phase that he has never had any memory (including
when he confessed to the police) of shooting his family.

 Q. [THE DEFENSE]: Abel, this is State's Exhibit either 2A or 2, voluntary
statement. You're familiar with this, aren't you?


 A. [APPELLANT]: Yes, sir.


 Q. You've gone over this many times with your attorneys, haven't you?


 A. Yes, sir.


 Q. Do you remember going to the closet and getting the gun?


 A. No, sir.


 Q. You understand, Abel, that in asking that question, you have several sources of
information. The first source is what you remember at the time. The second source
is what somebody might have told you immediately thereafter. And the third source,
of course, is what you have learned in trial over the last week. So when I ask you if
you remember getting the gun, are you saying that you have no-you did not have a
present memory of that when it happened?


 A. No, sir.


 Q. Is that what you're saying?


 A. Yes, sir.


 Q. Do you remember loading that gun?


 A. No, sir.


 Q. Remember cocking the gun, arming it, pulling the slide back?


 A. No, sir.


 Q. Do you remember walking from the bedroom to the living room?


 A. No, sir.


 Q. Do you remember discharging that firearm at [appellant's father-in-law]?


 A. No, sir.


 Q. Do you remember discharging that firearm at [Alma]?


 A. No, sir.


 Q. Do you remember discharging the firearm at [the murdered sister-in-law] and your
baby Anahi?


 A. No, sir.


 Q. Do you remember discharging that firearm at your wife?


 A. No, sir.


 Q. Do you have any independent recollection of going back and reloading the gun?


 A. Reloading the gun, yes.


 Q. You remember that from the time?


 A. Yes.


 Q. Do you have any idea what you were thinking as you were doing that?


 A. No, sir.


 Q. Do you remember coming back out of the bedroom and seeing Crystal and
discharging the firearm at her?


 A. I remember discharging the gun, yes. Walking through there, no.


 Q. Do you have any-did you have any thoughts at that time that you could remember.


 A. No.


 Appellant's testimony on cross-examination suggested that the police provided details known
only to appellant to put in his statement.

 Q. [PROSECUTION]: So let me get this straight. You're saying that Detective Lusty
told you some of the things to put in your own statement?


 A. [APPELLANT]: He would tell me stuff.


 Q. Like what?


 A. Like if I was in the 4Runner, if I drove it. And I would just say, Yeah, yeah,
that's-that's what happened.


 Q. What about this statement that you put in there: I knew if I asked my wife for
more money to buy some crack, she wouldn't let me have it. Did he know that? Did
he know your wife? Would he know that she would say that, or is that coming from
you in your statement?


 A. I don't recall saying that.


 Q. You don't recall saying that to [Detective] Lusty?


 A. No, sir.


 Q. Is that something he probably just added in there himself?


 A. I don't know if he added it in there, but I don't recall saying it to him.


 Q. Just like some type of crooked cop, he's making this up and just having you sign
it because you don't know what's going on at the time that you're going over this
statement? Is that what you want this jury to believe?


 [DEFENSE COUNSEL]: Objection, Your Honor, argumentative.


 [THE COURT]: Overruled.


 Q. Is that what you want this jury to believe, that [Detective] Lusty made up a bunch
of this stuff and just got you to sign this?


 A. I don't believe he's a crooked cop.


Appellant also testified on cross-examination.

 Q. [PROSECUTION]: All of a sudden, you give a detailed statement within hours
of murdering these people, and now you're coming in to disclaim that you don't
remember the details that's in that statement. Somebody must have told you that or
made that stuff up and had you sign it.


 A. [APPELLANT]: I remember where I went when I got in the vehicle, stuff like
that, but as far as the confession itself, that on paper, that I don't recall.


 Q. So you very well could have told all this to [Detective] Lusty, you just don't
remember telling him that?


 A. Yes, that's true.


 Q. Okay. So at the time of this when he takes the statement that evening of August
the 4th, you could have remembered all these details?


 A. I don't think so.

 

 Appellant presented other evidence that he had no criminal record and that, before his crack
cocaine addiction, he was considered by many to be a responsible, law-abiding citizen. Family,
friends and co-workers of appellant testified that they were shocked when they heard that appellant
had murdered his family because they did not believe that appellant was capable of committing such
an act.

 Appellant also presented expert testimony (Simon) that appellant suffered "mild" brain
damage from the crack cocaine that he ingested over the course of about two years. Appellant
presented the testimony of another expert (Nace) who testified that the shootings were the result of
a "cocaine-induced delirium" during which appellant was not fully aware and not in control of what
he was doing. This expert also testified that he did not think that appellant would be a continuing
threat to society.

 Q. [THE DEFENSE]: Doctor, what happened to [appellant] when he took cocaine
back on August 4th of 2002.


 A. [NACE]: He had not used cocaine for 10 days prior to August the 4th, and this was
a Sunday. Went to church with his family, and at some point after church-he had
been struggling with the desire for cocaine for days, and asked his wife could he just
get $10 worth. She eventually relented, gave him $10. She kept all the money
because he knew that, and she knew that if he had money, then the temptation to buy
cocaine would be there which is common in the case with people caught up in this. 
So he didn't keep any of the money. Anyway, she gave him $10. He bought the
crack cocaine. And she said, You have to smoke it outside. Okay? So he smoked
it outside. I think it was around about 5:30 or so, walked back into the house to the
bedroom, then his wife came in the bedroom and said, You didn't [say] hello to my
sisters, and said-he said, Well, I don't-I don't want them to see me like this. And
he had described that his-he felt his face was puffy and he felt he looked funny from
smoking the cocaine so she left the room and then shortly thereafter-and he doesn't
have memory for a good bit of this-got the gun that was in the house, and the
shootings took place after that.


 And what he recalled was hearing gunshots in his head, and then after he left the
house and got in his truck, he felt some-something-knew something had gone wrong
and he should return home. What he could recall, shooting one daughter, couldn't
recall whether people were exactly what-how it happened. And he was in a-cocaine-induced delirium, delirious state produced by the cocaine where there was a serious
change in brain functioning.


 Q. Doctor, a cocaine-induced delirium, is that a medically recognized decease [sic]?


 A. Yes, it is.


 Q. And is it found in the DSM IV?


 A. It is.


 Q. Would you explain to the jury briefly what the DSM IV is?


 A. The DSM IV is a book that catalogues all the different psychiatric disorders, from
depression, schizophrenia addictions and so on. They're all kind of listed there and
described and kind of the criteria for each disorder are laid out.


 Q. And that is a medically recognized diagnosis?


 A. Yes, it is.


 Q. All right. Doctor, a delirium is not a rational state, is it, or-


 A. No, a delirium is a very serious mental state provoked by different things, but
certainly drugs of abuse can produce a delirium. Cocaine is well known to do that. 
What happens is the person's level of consciousness is-is disrupted. It's changed. 
And they are in a position where they aren't as aware of what they're doing. They're
not as aware of their environment. They are not able to sometimes shift their
attention from what they're doing. They're-they get irritated, excited, aggressive
with certain types of delirium.


 Their thinking processes change at the same time. Typically, they won't have good
memory for parts of what's going on or what has happened. They will also have
perceptual disturbances. For example, in his case, he was hearing gunshots for-going
off in his head, the noise of the gunshot for days and had some other sort of flashes
going through his mind which he couldn't quite understand. Delirium typically does
not last very long, at least not a cocaine delirium.


 Q. Did I hear you say that he heard the gunshots in his head for days afterward?


 A. Yes.


 Q. Doctor, as a result of your interviews, of various documents that you have read,
as a result of your experience and training in the field of addictive behavior in the
general field of psychiatry, have you reached a conclusion as to whether [appellant]
is a danger, a continuing threat to society?


 A. I don't think he is a continuing threat.


 Q. Why is that, sir?


 A. What happened on August 4th was the result of his cocaine addiction and
triggering brain events beyond his control. And he has no history of being a danger
to society. Prior to that he had a good work record for the most part, at least prior to
his addiction. He was not-he didn't have a criminal history. He wasn't presenting
a danger to anybody, and there is no reason to think he would, if he's not addicted to
cocaine.

 

 Nace testified on cross-examination that he "would expect bad things could happen to"
appellant if appellant "got back to a repetitive pattern of cocaine use."

 Q. [PROSECUTION]: And if he were to get ahold of a dime rock of cocaine again
and take these two or three hits off of this, we could have another catastrophe on our
hands?


 A. [NACE]: We don't know that for sure because he's been off cocaine for eight to
nine months now. If he got back to a repetitive pattern of cocaine use, I would expect
bad things could happen to him.


 The prosecution's expert (Coons) provided testimony from which a jury could infer that
appellant would be a continuing threat to society. Coons also attributed the murders to appellant's
frustration and anger and not to a "cocaine-induced delirium."

 A. [COONS]: -Lusty, and others, these officers who arrested him and so forth-put
that all together and you look at the history that he's giving-given, adding it all
together, the history that comes from him runs like this: That he smoked the crack
cocaine in the backyard. People-he heard people in the house talking. He walked
in, walked past them. I believe I said hi. Went straight to the bedroom to lay down
on the bed, turned on the TV, looking at the ceiling. His wife came in and said, That
was rude. Why didn't you greet them, essentially. Didn't want them to see me this
way. While I was lying on the bed, my body started wanting more crack. I knew if
I asked my wife for more money to buy crack, she wouldn't let me have it. I knew
she would argue with me about the money just like we did in the past.


 And all that's in his original statement to Detective Lusty. And what that-what that
is, is a person who is-who is thinking it over, deciding what he wants to do, dealing
with his problem, which is, I want some more cocaine, and thinking through, Well,
I can't get it from my wife. She's not going to give me the money, she's going to get
in an argument with me, etcetera, just like we did in the past. And then he talks
about how, I got up off the bed and went to my closet. I got my Ruger 9mm gun. 
The gun was already loaded.


 Within 20 minutes or less, according to him and others-I believe someone else put
it at about 15 minutes, he comes out, walks into the living room, Where my family
was. And he said in the original statement to which was given a few hours after this
offense, that, I started shooting while they were all sitting on the couch. And he said
that he did not recall who he shot first. I ran out of bullets. I went back into the
bedroom. I got another clip. I walked back in the living room. My daughter Crystal
saw me with my gun. She started running away. I chased after her, and I shot her. 
Went back in the bedroom.


 I got my wife's small plastic purse, got in the car, drove to Wynnewood Shopping
Center, tried to get some money from an ATM machine. I didn't have the right code. 
I drove off, and the police stopped me. They requested his ID. He said-replied,
Sure. He was read his rights, told them he understood them. Where is the gun? This
is 6:33 p.m. This is within a half an hour after this offense, I believe, something on
that order-6:33 p.m.-6:10 I guess was the best guess, so that's 23 minutes after the
offense.


 Where is the gun? I left it in my house on the table. That's a reflection that he
recalls where he put the gun at the time that this offense was going on. And he gives
as an explanation, I couldn't handle the stress. And that's his explanation for having
done what he did, which is an indication that he did have an understanding of what
he did. I got tired of my life is another statement about-he asks at 7:45 about his-his
baby, and at 8:15, I can't believe I did that. This is his-his rendition at different
times of what happened there.


 All of those things reflect a perception of what happened, a recollection of what
happened, and all of those things notate against this being a delirium. That's why I
don't think it's a delirium. I think it's a matter of anger. I think he was extremely
frustrated with his situation. He was married-he had a difficult relationship with his
wife, partly because he was continuing to use cocaine and not being a husband and
father. And-partly because of this Jonathan problem that he had never gotten over.


 And I think that-if you look at the scene, you know this is-the first thing that comes
to your mind is anger. I mean, this was an angry slaughter of people. And
[appellant], I don't think, is in-I asked him something about his anger, and I don't
think he's in good touch with his-with his angry and frustrated feelings about the
situation he was in. He didn't have a job. His-he didn't have any money. He had
a cocaine problem. He had made the wrong choice. He didn't take his father's
advice and go into this program and get himself detoxified and off of it. Chose to
stay on it. And this is a result of it, a frustrated angry man.

 

 During closing jury arguments, the prosecution argued, among other things, that anyone
capable of murdering his family "is capable of anything."

 Is he going to be dangerous in the future? I mean, you know, Mr. Miller, [appellant]
is not a violent man. That is just unbelievable. These people, these bodies, the holes,
his own flesh and blood, willing to do that just because you're mad. Frustrated,
stressful, willing to do this, murder people like that. Anybody capable of doing that
is capable of anything, you know.


 Appellant argues that no rational jury could find beyond a reasonable doubt that there is a
probability that appellant would commit criminal acts of violence that would constitute a continuing
threat to society because appellant's acts of murdering his family were an aberration. He argues:

 In the instant cause, the evidence reflected that on August 4, 2002, appellant . . . went
from 0 to 60 in .01 of a second. He went from a hard working, law-abiding (except
for drug use) citizen and devoted family man to a man capable of slaughtering five
members of his immediate family and nearly mortally wounding a sixth. This
offense is notable not only for its horror but for the striking aberration from
appellant's previous behavior.

 

 We decide that a rational jury could find beyond a reasonable doubt that there is a probability
that "a man capable of slaughtering five members of his immediate family" would commit criminal
acts of violence that would constitute a continuing threat to society. See Sonnier v. State, 913
S.W.2d 511, 517-18 (Tex.Cr.App. 1995) (jury could rationally conclude from the results of
defendant's isolated incident of rage in murdering a mother and her two-year-old son that "his rage 
is of such an uncontrollable and extreme nature that he is a continuing danger to society"); Dinkins
v. State, 894 S.W.2d 330, 358-60 (Tex.Cr.App.), cert. denied, 516 U.S. 832 (1995) (evidence that
defendant inflicted multiple gunshot wounds at close range to one female murder victim and that he
killed the other female murder victim after hunting her down sufficient to support affirmative answer
to future dangerousness special issue). In addition, the evidence supports a finding that appellant's
murder of his family was not an aberration or an isolated incident and that it was the culmination of
a pattern of abuse and threats directed by appellant against his wife. And, appellant's own expert
testified that he "would expect bad things could happen to" appellant if appellant "got back to a
repetitive pattern of cocaine use." Point of error two is overruled.

 In point of error one, appellant claims that the trial court erred at the punishment phase "in
overruling appellant's objection to the admission of hearsay evidence and thereby deprived appellant
of his Sixth and Fourteenth Amendment right to the confrontation of the witnesses against him." 
The evidence, which is the subject of this point of error, is an August 1997 tape-recorded telephone
conversation between appellant and his wife while they were separated over the Jonathan issue. The
tape contains many statements. About half of appellant's statements on the tape are inaudible. 
Appellant complains about the following statements that his wife made during the August 1997 tape-recorded telephone conversation.

 [APPELLANT]: (Inaudible).


 [APPELLANT'S WIFE]: Why do you want to kill us?


 [APPELLANT]: (Inaudible).


 [APPELLANT'S WIFE]: What do you mean killed [sic] us? We haven't done
anything to you. You're the one that [sic] left.


 Appellant claims that these out-of-court statements by his wife were offered for the truth of
the matter asserted in them that appellant "was threatening to kill more than just her, perhaps also
his children and/or family, which of course is what he eventually did." We note (and believe it
relevant in resolving this point of error) that appellant also made a statement on the August 1997 tape
threatening to shoot his wife.

 [APPELLANT]: I am leaving. I am fixing to hang up. I have nothing else to say. 
If you have anything to say about my daughter call me-if not don't call me.


 [APPELLANT'S WIFE]: You're not gonna know nothing about your daughter.


 [APPELLANT]: Why not?


 [APPELLANT'S WIFE]: If she gets sick or anything you don't worry about us. 
We're not gonna worry about you. You look-


 [APPELLANT]: (Inaudible) you don't worry about me! My daughter worries about
me and I worry about her.


 [APPELLANT'S WIFE]: How do you know she worries, worries about you?


 [APPELLANT]: (Inaudible)


 [APPELLANT'S WIFE]: Look, she-


 [APPELLANT]: Well see, you're starting to piss me off again. You want me to go
shoot you right now? What's wrong with you man? Why do you act that way? Why
do you say these words to me? Jerk. Witch.


 When he testified at the punishment phase, appellant did not deny that he made the statement
on the August 1997 tape threatening to shoot his wife. He testified that his wife probably said
something that caused him to threaten to shoot her.

 Q. [PROSECUTION]: So why are you telling her then about coming over and
shooting her? Why are you saying that you wish you never had these children? Why
are you saying that? That's not due to anger?


 A. [APPELLANT]: Well, that phone conversation, she probably said something that
did make me mad or-one way or another, that caused me to say it.


 Q. So she would make you mad enough to where you would go and say, you know,
Why don't I come over and shoot you and I wish I never had these children?


 A. At times we would argue heavily, which the first time I slapped her which that's
what happened. A lot of times our arguments that we had, like any other couple,
would get real-real heavy. And a lot of times, you know, I would tell her, you know,
she wouldn't stop arguing. A lot of times I would tell her, you know, You need to
see a counselor. You don't know when to stop when we argue heavily, and, you
know, to say that-I mean, if I hadn't heard it on the tape, I wouldn't have believed
it myself.


 Q. And you sure wouldn't admit to doing it in front of this jury?


 [DEFENSE COUNSEL]: Object to side bar remark, Your Honor.


 Q. Is that true?


 [THE COURT]: Overruled.


 A. Can you repeat that?


 Q. That would be another thing you could deny if we didn't happen to have it on
tape. You would never admit to this jury that you ever threatened to shoot [your
wife]?


 A. I wouldn't remember it, no, but I would not-I'm here to tell the truth.


 Q. How many times do you think you told her that-or threatened her, to shoot her? 
How many times would you tell her that?


 A. I don't know. I don't think I told her any unless I-you know, if I hadn't heard that
tape, I would say none.


 Q. And that's just quite a coincidence the one time that you happen to threaten your
wife, tell her you would shoot her, just happens to be she had a tape recorder running. 
There is no other times?


 A. No, sir.


 Q. No other times you mention that you wish you'd never had those children?


 A. No, sir.


 Q. How about calling her a bitch and a whore, how often would you do that in front
of all-in front of her family?


 A. In front of her family, I don't believe any.


 The trial court overruled the following objection that appellant made to the admission of the
August 1997 tape.

 [APPELLANT]: Judge, first of all, it's hearsay. Second of all, it's not complete. 
You cannot hear the entire recording. And without the other end of the recording, we
have no way of knowing the context or what was said or anything else, because on
at least the first-more than 50 percent of this recording there's no voice that's audible
on the other end that can be identified.


 Furthermore, there's a voice somewhere in the middle of the tape, sounds like a
child. That voice has not been identified. We've got no evidence in the record with
regard to the recording device, how it was used, who made it, whether it's been
altered or anything else. And she comes on at the very end and says when this
conversation occurs, August 12th, 1997, on a Tuesday. You can obviously hear the
tape has been cut off and then that it is added at the end. We don't have any way of
knowing it was made at the same time. And there has been no testimony with regard
to that either.


 Furthermore, Judge, this conversation is completely out of context. It was made
more than 5 years-or 5 years prior to the events of August the 4th, 2002. It's strictly
done for inflammatory purposes. I submit that the jury is going to be free to surmise
the meaning behind these words without an explanation. For instance, on page 6 of
the transcript that has been provided to the Court where there is the mention of the
word "Why do you want to kill us? What do you mean killed us," I submit to the
Court that the meaning behind that has to do with the relationship and the marriage. 
It has nothing to do with bodily harm or a threat to commit bodily harm. But taken
out of context on this tape or whatever, whatever, without anybody to explain it, the
jury is free to presume that has to do with a physical threat to commit harm, and I do
not believe that's what the meaning of this conversation is at that point. And there's
no way for that to be explained. The State's free to argue its interpretation without
us knowing the true meaning behind that portion of the tape or the words.


 We don't believe the predicate has been laid for the admission of the tape. It is rank
hearsay. We are aware of the fact that the Court of Criminal Appeals in [citation
omitted] has basically stated that the previous requirements that were mentioned in
[citation omitted] were not necessarily valid or to be followed now. Their
interpretation was that those predicates have been subsumed in Rule 901 of the Texas
Rules of Evidence and it doesn't mean they've been taken away. It just means the
rule is going to control rather than the plain language of case law in [citation omitted]
which established the predicate for recording; that is, the device is capable of taking
the testimony, the operator of the device was competent, the authenticity of the
correctness of the recording, no changes, additions, or deletions have been made. 
The manner and preservation of the recording and of speakers and the testimony
elicited was voluntarily made without any kind of inducement. We will submit to the
Court that even that has not been satisfied.


 For all these reasons we object to the admission of this rank hearsay that has no way
of being verified.


 Appellant's trial objection, specifically mentioning only the wife's out-of-court statements,
"Why do you want to kill us? What do you mean killed us," raised no claim that the admission into
evidence of these out-of-court statements violated his federal constitutional right to confront the
witnesses against him. Appellant's trial objection, thus, does not comport with that raised on appeal,
and appellant, therefore, failed to preserve for review the federal constitutional confrontation claim
that he makes on appeal. See Tex. R. App. Proc., 33.1(a). 

 In addition, appellant's statement on the tape, "You want me to go shoot you right now," was
not hearsay and was properly admitted since it was offered to prove an assertion and not to prove the
truthfulness of an asserted fact. See Teague v. State, 864 S.W.2d 505, 519 (Tex.Cr.App. 1993),
overruled in part on other grounds, Robertson v. State, 871 S.W.2d 701, 712-13 n.13 (Tex.Cr.App.
1993), cert. denied, 513 U.S. 853 (1994). Under these circumstances, any error in admitting the
wife's out-of-court statements on the August 1997 tape was harmless. Cf. Leday v. State, 983
S.W.2d 713, 717-18 (Tex.Cr.App. 1998) (ruling admitting evidence usually will not be reversible
error when same evidence is admitted without objection). Point of error one is overruled.

 In point of error four, appellant also claims that the trial court erroneously admitted the
August 1997 tape "because appellant could not present the remainder of the tape in violation of Tex.
R. Evid. 106." Appellant also made the following objection to the admission of the August 1997
tape.

 [APPELLANT]: Judge, we would also object under Rule 106 that this is an
incomplete recording because a portion of it is inaudible and not-we have no way of
knowing what was said on the other end of the line, and we're entitled to have the
whole thing introduced if a portion is going to be introduced. And I'll submit that
can't happen because you can't hear what's said.


 Appellant argues on appeal that the inaudible portions of the tape made it incomplete for
purposes of Rule 106 which states:

 When a writing or recorded statement or part thereof is introduced by a party, an
adverse party may at that time introduce any other part or any other writing or
recorded statement which ought in fairness to be considered contemporaneously with
it. "Writing or recorded statement" includes depositions.


 We disagree. The inaudible portions of the tape did not make the tape incomplete. 
Introduction of the tape (including the inaudible portions) did not violate the "plain" language of
Rule 106. We also cannot conclude that the inaudible portions of the August 1997 tape are so
substantial as to render the tape as a whole untrustworthy. See United States v. Mickens, 837 F.Supp.
745 (S.D.W.Va. 1993), aff'd, 53 F.3d 329 (4th Cir. 1995) and authorities cited therein (discussing
general rule that "[u]less the unintelligible portions are so substantial as to render the recording as
a whole untrustworthy the recording is admissible, and the decision should be left to the sound
discretion of the trial judge"); see also Addison v. United States, 317 F.2d 808, 815 (5th Cir. 1963),
cert. denied, 376 U.S. 905 (1964) (trial court did not abuse its discretion to admit tape-recorded
conversation even though one-half of tape was inaudible); Odom v. State, 403 So.2d 936, 940 (Fla.
1981), cert. denied, 456 U.S. 925 (1982) and authorities cited therein (partial inaudibility or
unintelligibility not grounds for excluding a recording if audible parts are relevant, authenticated and
otherwise properly admissible). Point of error four is overruled.

 In point of error three, appellant claims that the trial court erred during the punishment phase
in overruling his hearsay objection to Alma's redirect examination testimony. Alma related an out-of-court statement by appellant's wife about three weeks before the offense that appellant held a gun
(the murder weapon) to his wife's head. 

 Q. [PROSECUTION]: Alma, when the Defense attorney asked you about the
defendant being a violent man, you knew him to be violent towards your sister
[appellant's wife], correct?


 A. [ALMA]: Yes.


 Q. And this was based on things other than what he said on that [August 1997] tape,
is it not?


 A. Yes.


 Q. Did your sister tell you about one particular incident during the summer of 2002,
about what [appellant] did to her prior to this shooting?


 A. Yes.


 [DEFENSE COUNSEL]: We object, Your Honor. Again, we would renew our
objection based on hearsay.


 [THE COURT]: I will overrule it. I believe the door has been opened.


 Q. What did your sister tell you that he started doing with this gun of his?


 A. That he would point it to her head.


 Q. She would tell you that [appellant] would point this gun to her head. When did
she start telling you this?


 A. Like three weeks after this happened.


 Q. Three weeks before this happened?


 A. Yes.


 Q. And why would he be pointing this gun to her head?


 A. She just told me that if ever-something ever happened to her, that it was him.


 Q. Did that upset you when you heard this?


 A. Yes.


 Q. And was she upset when she would tell you about this?


 A. She was scared and upset.

 

 The State claims that appellant's wife's out-of-court statement to Alma was admissible under
the excited utterance exception to the hearsay rule "because it was made while [appellant's wife] was
under the continuing stress of a death threat made by her husband." The State also claims that,
during her direct examination, Alma expressed a non-expert witness opinion on appellant's character
for violence when she testified that appellant became mean and aggressive toward his wife when he
found out about Jonathan. The State further argues that defense counsel's cross-examination tested
whether Alma's non-expert opinion was "rationally based on her perceptions." The State, therefore,
argues that appellant's wife's out-of-court statement to Alma was not offered on redirect
examination to prove the truthfulness of the matter asserted in it (i.e., that appellant held a gun to his
wife's head); it was offered for a nonhearsay purpose to show the basis of Alma's non-expert opinion
that appellant was violent. The State argues:

 Alma's direct testimony evinced her opinion of appellant as mean and aggressive
towards [his wife] after he learned that Jonathan was [his wife's] son. Defense
counsel's cross-examination tested whether Alma's opinion was "rationally based on
her perceptions." Specifically, defense counsel discredited Alma's opinion by
leaving the impression that it was based only on the [August] 1997 tape recording. 
Because counsel attacked the foundation of Alma's opinion and left a false
impression, the State properly could inquire into "the whole" of that subject.
[Citation and footnote omitted]. The prosecutor would not have had to ask for
specific evidence supporting Alma's opinion had defense counsel not challenged the
witness's testimony as he did.

 

 We need not address the State's theories of the admissibility of appellant's wife's out-of-court statement to Alma that appellant held a gun to her head. The record reflects that appellant's
father provided substantially similar evidence without objection by appellant.

 Q. [PROSECUTION]: Thirty-two years. Do you recall a time when [appellant's
wife] told you that [appellant] was pointing a gun at her?


 A. [APPELLANT'S FATHER]: No.


 Q. Told you and -


 A. No, she never told me that.


 Q. Never told you that?


 A. Not to me, no.


 Q. Not to you? Never to your wife?


 A. Yes, she told her.


 Q. Okay. And your wife told you about it?


 A. Yes, sir.


 Q. Did this upset you, Mr. Ochoa?


 A. Yes.


 Q. Do you recall about when this was in relation to the shootings that your wife told
you what [appellant's wife] had told her?


 A. About three months

.

 Appellant's expert also testified on cross-examination by the prosecution without objection
by appellant.

 Q. [PROSECUTION]: What other alleged acts of violence [by appellant] are you
aware of?


 A. [NACE]: Well, I believe his wife had told his mother that he held a gun to her one
time around-I guess it was around '97, but the family wasn't sure that was true or
not.


 This expert also testified on re-cross examination by the prosecution without objection by
appellant.

 Q. [PROSECUTION]: Doctor, did you say that you confronted the defendant over
this-over him pointing the gun to her head three weeks before he murdered her?


 A. [NACE]: No, I don't think I said that.


 Q. You didn't ask him about that?


 A. I remember asking him about slapping his wife.


 Q. Okay. Did you ask him to relate to you, I guess, the totality of any violence that
he might have had against anybody, including his wife?


 A. Yes.


 Q. And all he told you was hitting his wife twice?


 A. That's what I recall.


 Q. He didn't tell you about any gun pointing or ever making a threat to kill her? He
didn't mention that?


 A. No. I had read that in one of these documents, but I didn't-no, we didn't talk
about it.


 Q. And you didn't-even though you knew about it, you didn't ask him if it was true
or not?


 A. I don't-I might not have. I don't recall asking.


 Q. And he just told you he hit her twice. You don't know when or what over or what
brought that on, if it was while he was on cocaine or before he was using cocaine,
you don't know when exactly that was?


 A. I think it was before cocaine use.


 Q. Before cocaine use?


 A. Yes.


 Q. Okay. And that's the extent, everything he told you that he had done, either
threatening or violently towards his wife?


 A. That's my recollection.

 

 Under these circumstances, the admission into evidence of appellant's wife's out-of-court
statement to Alma that appellant held a gun to his wife's head is not reversible error. Cf. Leday, 983
S.W.2d at 717-18. Point of error three is overruled.

 In point of error five, appellant claims that the trial court erroneously admitted into evidence
at the guilt/innocence phase a crime-scene photograph (State's Exhibit 35) showing his murdered
seven-year-old daughter's hip and arm in a pool of blood on the kitchen floor with a television
remote control in her hand. Appellant claims on appeal that the probative value of this photograph
was substantially outweighed by the danger of unfair prejudice under Tex. R. Evid. 403 and that it
"inflamed the jury against appellant with regard to determining the special issues in this cause."

 The record reflects that appellant objected to the admission of State's Exhibit 35 on Rule 403
grounds, and also because it was cumulative of State's Exhibit 34 (to which appellant did not object),
and it was "just egregious in the amount of blood that's shown and that it does not go to wounds and
that it goes to no material contested issue." The prosecution responded that State's Exhibit 35 was
a clearer picture of some of what State's Exhibit 34 depicted.

 [THE COURT]: I will allow 31-30, and I will overrule the Defense's objection to 30.


 34 and 35?


 [PROSECUTION]: Judge, 35 is finally a clear picture. This other one [State's
Exhibit 34] is dim, and you can't actually make out what's on the other side, the far
side of her body. This is just a different perspective to show what she is actually
holding and you get a picture from that angle. Right now you just have a-the right
side of her body. This one you see the left side and what is she actually holding. I
just say in 34 it's just hard to make that out, the dim lighting in that picture.


 [THE COURT]: I'll overrule the Defense's objection to State's 35.


 With the admission into evidence of all of the other crime-scene and autopsy photographs
depicting the murders of five members of appellant's family, any error in the admission into
evidence of State's Exhibit 35 did not harm appellant. Cf. Leday, 983 S.W.2d at 717-18. Point of
error five is overruled.

 The judgment of the trial court is affirmed.


 Hervey, J.


Delivered: January 26, 2005

Do Not Publish